[No. H009350. Sixth Dist. July 15, 1994.]

JOHN ROSH et al., Plaintiffs and Respondents, v.
CAVE IMAGING SYSTEMS, INC., Defendant and Appellant;
INDUSTRIAL INDEMNITY COMPANY, Intervener and Respondent.

**COUNSEL**

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Mark G. Bonino, Robert P. Andris, Tarkington, O'Connor & O'Neill and Bryan A. Marmesh for Defendant and Appellant.

Hinton & Alfert, Peter J. Hinton, Peter W. Alfert, Crosby, Heafey, Roach & May, James C. Martin and Paul D. Fogel for Plaintiffs and Respondents.

Klein, Brunet & Chew and Mark S. Klein for Intervener and Respondent.

## OPINION

**MIHARA, J.**—Defendant Cave Imaging Systems, Inc., appeals from a judgment entered in favor of plaintiffs John and Ruth Rosh.[1] Defendant provided security services for Mr. Rosh's employer, Conner Peripherals. In his management capacity at Conner Peripherals Mr. Rosh terminated an employee. The employee then returned to the premises and shot Mr. Rosh. Plaintiffs brought an action alleging that defendant had negligently failed to provide adequate security at Conner Peripherals. The jury awarded plaintiffs damages in excess of $5 million. On appeal, defendant contends the following: (1) the jury improperly apportioned liability by finding defendant was more responsible for plaintiffs' injuries than the intentional tortfeasor; (2) there is no evidence that defendant proximately caused plaintiffs' injuries; and (3) the trial court exceeded its jurisdiction when it entered an amended judgment in an amount in excess of defendant's insurance policy limits. We affirm.

### Statement of Facts

Conner Peripherals is a computer hardware manufacturer with a facility in San Jose. In 1987 Conner Peripherals contracted with defendant to provide security services. By 1988, Conner Peripherals was paying defendant $1 million a year for protection provided by 35 to 40 uniformed guards, closed-circuit television cameras, and other equipment. Though defendant's contract provided that it would use only trained personnel, untrained personnel were placed in guard positions on several occasions.

Defendant's guards were stationed in the following locations: building 1 where the main radio and closed-circuit television center was located; building 2; the main parking lot entrance; and at a remote parking lot a few miles away. "Rover" guards in each building were responsible for patrolling inside and outside the buildings; checking employee badges, visitor passes and parking permits; and ensuring that no suspicious individuals were on the property. The rover guard for building 2 was based at the security desk in that building. The receptionist guard for building 2 was also stationed at this security desk and was responsible for ensuring that everyone who entered

---

[1]Intervener Industrial Indemnity Company joined the brief filed by plaintiffs.

had a badge or was properly registered. Both through the glass front of the building and via the closed-circuit camera, these guards had a view of the parking lot and were thus able to detect unauthorized individuals who entered it.

Defendant's employees were aware of the threat posed by ex-employees. Eduardo Cabrera, defendant's president, had discussed the issue with executives at Conner Peripherals and had held meetings with his own employees. Defendant's employees were required to investigate all suspicious individuals, including terminated employees. Defendant's training manual warned guards to be alert to terminated employees who might want to retaliate; it stated that "limiting and controlling access to the customer's property is a most important step to achieving the control we need to protect." The manual also cautioned guards to be "on the alert for threats or other indications that ex-employees may try to get back at the company later," and required guards to escort unauthorized individuals off the property.

In 1988, John Rosh began working as a manager for Conner Peripherals. His duties consisted of hiring, supervising, disciplining, and terminating technicians and test operator employees. As a manager, he was permitted under company policy to terminate temporary employees on his own initiative.

Between 9 and 10 a.m. on December 28, 1988, Mr. Rosh was told that Tung Ngoc Hua, a temporary employee, had arrived four hours late for work. Mr. Hua had been late on several occasions, had received warnings, and had been told he would be fired if he missed work again. When Mr. Rosh fired Mr. Hua for tardiness, he became angry. Mr. Rosh then escorted him to the security desk in building 2 where defendant's guards Hazel Corpus and Rosemary Bustamante were sitting. After Mr. Hua surrendered his badge, Mr. Rosh told the guards that Mr. Hua was no longer employed by Conner Peripherals and that he was not permitted on the premises. Mr. Rosh gave the guards Mr. Hua's full name and badge number. Ms. Corpus said the guards would "take care of it." Mr. Rosh then completed the necessary paperwork.

Defendant lost or misplaced its written "Daily Activity Reports" (DAR's) for December 28 and 29, 1988 which would have reflected Mr. Hua's termination and Mr. Rosh's instruction prohibiting him from entering Conner Peripheral's property. However, the "Daily Activity Log" for December 28, 1988, which was compiled from that day's DAR's stated: "Tung Hua, badge 8603 got fired today and his manager, John Rosh doesn't want him on Conner premises." Information about Mr. Hua's termination was not disseminated to defendant's employees.

Later in the morning of December 28, 1988, Mr. Rosh glanced out into the parking lot and saw Mr. Hua. Mr. Rosh pointed him out to Ms. Corpus and told him that "this morning I told you guys that this man has been fired, he shouldn't be there." Ms. Corpus and Ms. Bustamante again said they would "take care" of it. However, neither guard did anything.

The next day Mr. Hua drove into the main parking lot and told the guard that he was a former Conner Peripherals employee and would come out "right away." The guard said, "All right," and let him enter. Shortly thereafter, Mr. Rosh saw Mr. Hua. Mr. Rosh again told Ms. Corpus that Mr. Hua had returned and Ms. Corpus again assured Mr. Rosh that the guards would "take care of it." The guards again did nothing.

As he was returning from lunch, William Yousif, a Conner Peripherals employee, saw Mr. Hua standing in the parking lot. Mr. Yousif knew that Mr. Hua had been fired and was not allowed on the premises. Mr. Yousif then asked Mr. Rosh whether security knew about Mr. Hua. Mr. Rosh replied that it did. Nevertheless, Mr. Yousif told Ms. Bustamante that Mr. Hua was in the parking lot and should not be there. Ms. Bustamante told him, "Don't worry, we [will] take care of that." She did nothing.

After Mr. Hua left the premises, he called Mr. Rosh and told him he had not yet found a job. Mr. Rosh said he hoped he would find one. After the telephone call, Mr. Rosh was asked to pose for a photograph with a group of employees. While Mr. Rosh was talking to members of the group, Mr. Hua drove into the parking lot. There was no guard at the entrance to the parking lot. Maria Robles, the guard assigned to that post, had been instructed to relieve the remote parking lot guard, who had gone to lunch. Ms. Robles stayed at that post because the remote parking lot guard failed to return.

Mr. Hua drove to the front of the building, parked his car, exited, and yelled, "John." Mr. Rosh turned, recognized Mr. Hua, and walked toward him. Mr. Hua then pulled a gun from his pocket. When Mr. Rosh ran, Mr. Hua shot him in the back. As Mr. Rosh was lying on the ground, Mr. Hua approached him, pointed the gun, and said, "I'm going to shoot you in the head one more time." Mr. Hua continued to threaten him. When the police arrived, Mr. Hua surrendered his gun and was arrested. An ambulance took Mr. Rosh to the hospital. Ms. Bustamante and Ms. Corpus remained inside building 2 until Mr. Hua was taken away.

Ms. Bustamante told Mr. Yousif that Mr. Rosh had been shot. Mr. Yousif said, "I told you," to which Ms. Bustamante replied, "Yeah, you told me, you told me about the guy." Defendant's employees told police they knew

Mr. Hua had been terminated, that he had been told to stay away from the premises, and that he had been seen on the premises that morning.

Dale Wunderlich, a security expert, testified that he had worked for the Secret Service and private industry. He had performed approximately 400 security audits and surveys, taught courses on security surveys, designed security systems for governmental agencies and private companies, and qualified as an expert witness more than 300 times. Mr. Wunderlich testified that defendant's conduct fell below the standard of care for a security guard company.

Mr. Wunderlich explained the basis for his opinion. He testified that though some of defendant's guards knew that Mr. Hua had been terminated and was not permitted on the premises, defendant failed to disseminate the information to all its employees. According to Mr. Wunderlich, the guards should have denied Mr. Hua access when he first tried to return, escorted him off the premises or informed others that he had returned. Mr. Hua's second return should have aroused a "high level of concern," and the guards should have immediately escorted him away and called the police. When he returned the third time, they should have called the police.

Mr. Rosh was severely injured by the shooting. His spinal cord was damaged, thereby resulting in permanent partial paralysis, numbness, constant radiating pain from the waist down, sexual dysfunction, and bowel and bladder control problems. He cannot sit, stand, drive or walk for extended periods. Though he has undergone counseling and physical therapy, he has experienced a loss of confidence and energy and no longer participates in family activities.

In June 1989, Mr. Rosh filed a complaint alleging that his injuries were the foreseeable result of defendant's negligent failure to provide adequate security at Conner Peripherals. His wife joined in the complaint and sought damages for loss of consortium.

In April 1991, defendant filed a petition for bankruptcy. The bankruptcy court permitted the trial to go forward provided that plaintiffs could not recover against defendant any amount not covered by defendant's insurance policy without further court order.

In September 1991, the matter went to trial. At the conclusion of the liability phase, the jury found defendant was negligent and that its negligence was a legal cause of plaintiffs' injuries. It also found defendant was 75 percent at fault for the shooting and that Mr. Hua was 25 percent at fault.

The jury awarded Mr. Rosh $1,470,000 and $2,990,000 in economic and noneconomic damages, respectively, and Mrs. Rosh $1 million in noneconomic damages. The trial court deducted 25 percent of the noneconomic awards pursuant to Proposition 51, a workers' compensation lien, and one cost item. It then added to the remainder costs and prejudgment interest and entered an amended judgment for $4,316,675.35 for Mr. Rosh and $895,007.13 for Mrs. Rosh.

*Discussion*

## I. *Apportionment of Liability*

■ Defendant first contends no reasonable person could conclude a negligent tortfeasor was more responsible for an injury than an intentional tortfeasor. We disagree.

■ Since the comparative fault doctrine was first adopted in California in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], our Supreme Court has repeatedly acknowledged that it is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine "is a flexible, commonsense concept, under which a jury properlymay consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of loss.'" (*Knight* v. *Jewett* (1992) 3 Cal.4th 296, 314 [11 Cal.Rptr.2d 2, 834 P.2d 696]. "'[C]omparative negligence'" does not lend itself to "the exact measurements of a micrometer-caliper." (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 736 [144 Cal.Rptr. 380, 575 P.2d 1162]; see also *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 328-332 [146 Cal.Rptr. 550, 579 P.2d 441]; *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 594-595 [146 Cal.Rptr. 182, 578 P.2d 899].) The court has also noted that juries are "fully competent to apply comparative fault principles . . . ." (*Safeway Stores, Inc.* v. *Nest-Kart, supra*, 21 Cal.3d 322, 331.) Thus, in *Daly* v. *General Motors Corp., supra*, 20 Cal.3d 725, 738, the court rejected the claim that a jury is unable to apportion fault where different classes of tortfeasors are involved.[2]

■ As one commentator has noted, "[c]ourts in comparative negligence states are usually circumspect about altering determinations made by the

---

[2]Courts in other jurisdictions are in agreement on this point. (See, e.g., *Martin* v. *Bussert* (1971) 292 Minn. 29 [193 N.W.2d 134, 139]; *Bourassa* v. *Gateway Erectors, Inc.* (1972) 54 Wis.2d 176 [194 N.W.2d 602, 604]; *Transamerica Insurance Co.* v. *Pueblo Gas & Fuel Co.* (1973) 33 Colo.App. 92 [519 P.2d 1201, 1204].)

jury. The courts will rarely disturb the jury's apportionment of negligence between parties or reverse findings for the plaintiff or defendant." (Schwartz, Comparative Negligence (2d ed. 1986) § 18.1 at p. 315.)

This court reviews the jury's apportionment of fault under the substantial evidence standard. (*Von Beltz* v. *Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1483 [255 Cal.Rptr. 755].) As the court noted in *Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 346 [145 Cal.Rptr. 47], the jury's power to apportion fault is as broad as its duty to resolve conflicts in the evidence and assess credibility: "These same considerations apply to the jury's apportionment of fault under comparative negligence rules. Furthermore, the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]" (See also *Metzger* v. *Barnes* (1977) 74 Cal.App.3d 6, 9-10 [141 Cal.Rptr. 257].)

 Here the evidence supports the jury's apportionment of fault. The liability theory against defendant did not lend itself to an apportionment of substantial fault to Mr. Hua and minimal fault to defendant or even equal fault to each. If the jury was going to find defendant negligent, it was because it believed that defendant negligently permitted Mr. Hua to repeatedly enter the premises of Conner Peripherals. The evidence clearly supported this theory. Defendant was hired to protect the personnel and property of Conner Peripherals. Defendant's employees were also aware that terminated employees pose a security risk, that Mr. Hua had been terminated, and that he was no longer allowed on the premises. Nevertheless, they allowed Mr. Hua to remain on the premises on three occasions within twenty-six hours of his termination. When informed of Mr. Hua's presence on the premises, defendant's employees also stated they would "take care" of the matter. Under these circumstances, there is substantial evidence to support the jury's apportionment of fault.

Defendant suggests, however, that this court follow cases involving excessive damage awards. In those cases, the amount of damages awarded to the plaintiff is also a question to be resolved by the trier of fact. (*Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259 [259 Cal.Rptr. 311].) A reviewing court will overturn a damage award only where "the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727 [236 Cal.Rptr. 633].) Even applying this standard to the instant case, we would not overturn the award due to the egregious nature of defendant's conduct.

Defendant's reliance on *Weidenfeller* v. *Star & Garter* (1991) 1 Cal.App.4th 1 [2 Cal.Rptr.2d 14], is also misplaced. In *Weidenfeller,* the

plaintiff was the victim of an assault in a bar parking lot. The plaintiff brought an action against the bar and alleged that its failure to provide adequate lighting and other security services was a substantial factor in causing his injuries. The jury assessed 75 percent fault to the assailant, 20 percent to the bar, and 5 percent to the plaintiff. The court rejected the plaintiff's due process argument that the jury was unable to compare intentional misconduct and negligence, stating "The jury here found defendants to be a substantial factor in causing [the plaintiff's] injuries, but apportioned most of the fault to the individual who actually pulled the trigger. This verdict reflects the jury applied a proper standard and understood fully how to compare the torfeasor's conduct." (*Id.* at p. 8.) *Weidenfeller* does not stand for the proposition that a jury must make this type of apportionment in every case where there are intentional and negligent tortfeasors. Moreover, the facts of *Weidenfeller* are readily distinguishable from those before us. In *Weidenfeller*, there was no evidence the bar had notice that its parking lot was inadequately guarded, that a would-be assailant had returned several times to the premises, that a particular patron would be at risk, or that security procedures were being violated.

## II. *Causation*

■ Defendant next contends the judgment must be reversed because there is no evidence that it proximately caused plaintiffs' injuries. Defendant claims that even if it had undertaken every reasonable precaution there is no evidence that Mr. Hua would not have injured Mr. Rosh.

■ " 'Legal cause' exists if the actor's conduct is a 'substantial factor' in bringing about the harm and there is no rule of law relieving the actor from liability. [Citations.]" (*Nola M.* v. *University of Southern California* (1993) 16 Cal.App.4th 421, 427 [20 Cal.Rptr.2d 97].) The question of causation is one of fact; it becomes a question of law only where reasonable people do not dispute the absence of causation. (*Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 207 [223 Cal.Rptr. 645].) ■ It is also a question of fact when the issue is whether the defendant's negligence was a substantial factor in causing injuries inflicted during a criminal attack by a third party. (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 411 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324].) The defendant has the burden of establishing there was not " 'room for a reasonable difference of opinion' " on the issue of causation. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1063-1065 [232 Cal.Rptr. 528, 728 P.2d 1163].) In determining whether defendant has met this burden, the reviewing court views the record in the light most favorable to the judgment. (*Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 244 [60 Cal.Rptr. 510, 430 P.2d 68].)

In *Landeros* v. *Flood, supra,* 17 Cal.3d 399, the plaintiff alleged that her physician was negligent in failing to diagnose her as a battered child and refer the matter to the appropriate law enforcement authorities. She further alleged that following the physician's negligence she was returned to her parents who inflicted severe injuries. The California Supreme Court acknowledged that while her parents' conduct was the immediate cause in fact for her injuries, the physician's negligence could nonetheless be the proximate cause of the injuries if the parents' conduct " 'was reasonably foreseeable at the time of [the physician's] negligent conduct.' " (*Id.* at p. 411, quoting *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151].) In reaching its conclusion the court relied upon section 449 of the Restatement Second of Torts which states: "If the likelihood that a third person may act in a particular manner is . . . one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, *or criminal* does not prevent the actor from being liable for harm caused thereby." (5 Cal.3d at p. 163.)

 Here Conner Peripherals hired defendant to provide protection to its employees and property. Defendant's employees were aware of the danger that a terminated employee might pose to the person who terminated him or her and defendant's guards were authorized to refuse entry to recently terminated employees. Defendant's employees were aware that Mr. Hua had been terminated and was no longer allowed on the premises, but defendant failed to disseminate this information to all of its employees. Though defendant was told on three separate occasions that Mr. Hua was again on the premises without authorization, defendant permitted Mr. Hua to enter the premises three times within twenty-six hours of his termination. Defendant's employees assured others the matter would be resolved; however, they did nothing on each occasion. Moreover, there was no parking guard on duty when Mr. Hua entered the premises. Based on this evidence, the jury could have reasonably concluded that Mr. Hua's multiple, unrestricted entries demonstrated to him how lax defendant's security was and that he could freely enter the premises and cause injury to Mr. Rosh. It " 'was reasonably foreseeable at the time of [defendant's] negligent conduct" that Mr. Hua would harm Mr. Rosh. (*Landeros* v. *Flood, supra,* 17 Cal.3d 399, 411.) Thus, there is sufficient evidence that defendant's negligence was a substantial factor in facilitating the attack on Mr. Rosh.[3]

Relying upon *Marois* v. *Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193 [208 Cal.Rptr. 384], defendant contends the issue was

---

[3]Authorities from other jurisdictions also support our conclusion that where security guards fail to deter criminal activity, the issue of causation is to be resolved by the trier of fact. In *Tucker* v. *Sandlin* (1983) 126 Mich.App. 701 [337 N.W.2d 637], when a security guard discovered an assault in the student parking structure, he told the victim he would " 'take care' " of informing the police. However, the guard failed to immediately notify the police, and the plaintiff was also assaulted in the parking structure. The Michigan Court of Appeals

whether defendant's guards acted reasonably in their response to Mr. Hua's final visit to the premises and that their prior failure to act was irrelevant. *Marois* does not support this contention. In *Marois*, the plaintiff brought an action against a security guard company after he was attacked by an assailant in a restaurant parking lot. When the assailant, wearing bloody clothing, had entered the restaurant before the attack, the security guard asked him to leave. The assailant went to the parking lot where he vandalized a kiosk. At this point, plaintiff's friend began fighting with the assailant and the plaintiff armed himself with a beer bottle. However, when the assailant threatened the plaintiff, the plaintiff retreated. The assailant then pursued and attacked the plaintiff.

The *Marois* court held the security guards were not negligent as a matter of law before the plaintiff's friend approached the assailant because they did what could be reasonably expected of them. However, the court also held that because there was a factual question as to whether the security guards acted reasonably after that point, the trial court erred by granting the security guard company's motion for nonsuit. In contrast to *Marois*, here there was ample evidence that defendant's conduct prior to Mr. Hua's final visit was negligent.

Defendant relies primarily on *Nola M.* v. *University of Southern California, supra,* 16 Cal.App.4th 421. In *Nola M.,* the plaintiff was sexually assaulted on the campus of the University of Southern California (USC). She filed an action against USC in which she alleged that it was negligent in failing to provide adequate security. At trial, the plaintiff's expert criticized the manner in which the security officers were permitted to exercise discretion about where to patrol, the insufficient communication system, the number of security officers, and the amount of foliage and lighting near where the plaintiff was attacked. The security expert did not testify that compliance with what he regarded as adequate security would have prevented the attack. The court concluded: " [R]easonable protective measures cannot stop wanton violence and that even significant increases in police personnel cannot prevent all crime or any particular crime. . . . [¶] But where, as here, we are presented with an open area which could be fully protected, if at all, only by

concluded "[a] jury could reasonably find that [the security guard's] omission directly caused plaintiff's injuries, by enabling the assailant to remain on the premises and carry on his criminal conduct without interruption." (*Id.* at p. 640.)

In *Wooldridge* v. *Echelon Service Co.* (1992) 243 Va. 458 [416 S.E.2d 441], the Virginia Supreme Court reinstated a verdict for the estate of a woman who was killed in an office building. The security guards had seen an individual enter the building at night and called to him. In violation of the admission procedures, they did not pursue him when he entered an elevator. The court stated there was "credible evidence upon which a jury could conclude that the inaction was a proximate cause [of the killing]." (*Id.* at p. 443.)

a Berlin Wall, we do not believe a landowner is the cause of a physical assault it could not reasonably have prevented. [Citation.]" (*Id.* at pp. 436-437.)

The *Nola M.* court relied upon *Noble* v. *Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912 [214 Cal.Rptr. 395], and *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200 [223 Cal.Rptr. 645]. In *Noble,* the plaintiff was injured when he assisted a man who had been attacked by two others in the defendant's stadium parking lot. The plaintiff's theory was that the defendant landowner was negligent in failing to deter anyone from acting in a tortious manner. The plaintiff did not contend the defendant had advance notice of the tortious conduct or knowledge of the third parties in the parking lot. The reviewing court reversed the jury's finding on causation and stated, "The present case is a classic example of a plaintiff establishing what could be described as abstract negligence, in the context that the Dodgers' security didn't comport with plaintiffs' expert's or the jury's notion of 'adequacy,' but failing to prove any causal connection between that negligence and the injury." (168 Cal.App.3d at p. 918.)

In *Constance B.,* the plaintiff was assaulted in the restroom of a state-owned rest area. In her action against the state, she alleged that the placement of lights and trees provided a place for concealment. The court rejected the argument, stating that "[i]f liability may be premised solely on this notion, proprietors will become the insurers of the safety of persons on their premises, subject only to the caprice of particular juries." (178 Cal.App.3d at p. 212.)

*Nola M., Noble,* and *Constance B.* are readily distinguishable from the instant case. In each of those cases, the defendant did not have advance notice that a particular assailant was on the premises. Here employees reported to defendant's guards on three occasions that Mr. Hua, an individual who fell within the class from whom employees of Conner Peripherals needed protection, was on the premises without authorization. Moreover, defendant was not a landowner with a duty to keep its premises safe, but instead was a company which ostensibly provided protection and deterrence from criminal activity in the workplace. Under these circumstances, causation was a question for the jury to resolve.

Defendant also relies upon *Thai* v. *Stang* (1989) 214 Cal.App.3d 1264 [263 Cal.Rptr. 202], and *Brownell* v. *Los Angeles Unified School Dist.* (1992) 4 Cal.App.4th 787 [5 Cal.Rptr.2d 756]. However, in each of those cases, the court held the defendant had no duty to the plaintiff. In *Thai,* the court found an owner of a roller rink owed no duty "to protect against drive-by shootings," because to conclude otherwise would "place an onerous burden on

business owners." (214 Cal.App.3d at p. 1273.) In dicta, the court noted that there was uncontradicted evidence that the presence of a security guard would not have prevented the shooting. (*Id.* at p. 1274.) In *Brownell*, the court held the school district had met its duty to a student who was the victim of gang violence which occurred adjacent to the school, but it had no duty to take additional measures against threats it neither knew nor should have known about. (4 Cal.App.4th at p. 798.) Here defendant is not disputing that it owed a duty to Mr. Roth.

III. *Jurisdiction*

 Defendant also contends the trial court exceeded its jurisdiction when it entered the amended judgment in an amount in excess of $1 million.[4]

 After a petition for bankruptcy is filed, there is an automatic stay of all legal proceedings against the debtor. (11 U.S.C. § 362(a).) As a matter of law, any action in violation of the stay is void. (See *In re Farmers Markets, Inc.* (9th Cir. 1986) 792 F.2d 1400, 1404.) When approved by the court, the automatic stay may be modified. (11 U.S.C. § 362(d).) In *Matter of Holtkamp* (7th Cir. 1982) 669 F.2d 505, 507-509, the bankruptcy court lifted the stay to permit a personal injury action to proceed, but limited the collection of judgment. The reviewing court found there was no abuse of discretion. (See also *Matter of Fernstrom Storage and Van Co.* (7th Cir. 1991) 938 F.2d 731, 735.)

Here the complaint was filed in June 1989. When defendant filed its petition in bankruptcy on April 4, 1991, an automatic stay issued. On April 8, 1991, the bankruptcy court modified the stay to allow plaintiffs "to continue to prosecute their case" and "to recover any judgment so long as such recovery does not exceed the policy limits under any of the debtor's liability insurance policies . . . ." The bankruptcy court order also stated that plaintiffs "are not authorized to recover any property or assets of the debtor's estate other than insurance coverage under any of debtor's insurance policies without further order of this court." The trial court entered an amended judgment in the amount of $4,316,675.35 for Mr. Rosh and $895,007.13 for Mrs. Rosh. On February 12, 1992, the bankruptcy court entered an order which stated plaintiffs "may recover and execute against all available insurance proceeds insuring [defendant] for the claims of John Rosh and Ruth Ann Rosh." The order also stated as follows: "John Rosh and Ruth Ann Rosh may file claims in the bankruptcy proceeding for the insured portion of the judgment and for the uninsured portion of the judgment, that

---

[4]According to defendant, defendant's liability insurance policy has a limit of $1 million.

amount being the difference between the judgment and the amount of insurance coverage available to pay the claims of John Rosh and Ruth Ann Rosh, subject to the right of the trustee to object to said claims." Thus, here the bankruptcy court partially lifted the automatic stay, allowed the state court to conduct a jury trial, and limited recovery to available insurance proceeds. It then modified the order to allow plaintiffs to file claims in bankruptcy proceedings.

Defendant argues, however, that the trial court had no jurisdiction to enter the amended judgment in excess of the policy limits. We disagree. The bankruptcy court order limits the amount of recovery, it does not limit the amount of the judgment. Our interpretation is supported by the bankruptcy court's subsequent order in which it acknowledged that the judgment was in excess of the insurance policy limits and allowed plaintiffs to file claims for both the insured and uninsured portions of the judgment in the bankruptcy proceeding.

*Disposition*

The judgment is affirmed.

Premo, Acting P. J., and Wunderlich, J., concurred.

A petition for a rehearing was denied August 10, 1994, and appellant's petition for review by the Supreme Court was denied October 13, 1994.