ATTORNEYS FOR APPELLANTS

Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

P. Gregory Cross
The Cross Law Firm
Muncie, Indiana

Michael D. Wilhelm
Defur Voran LLP
Fishers, Indiana

Anthony W. Patterson
Peter L. Obremskey
John M. McLaughlin
Paul Kruse
Parr Richey Obremskey Frandsen & Patterson
LLP
Lebanon, Indiana

James R. Williams
Scott E. Shockley
Defur Voran LLP
Muncie, Indiana

Kenneth J. Allen
Robert D. Brown
Sarah M. Cafiero
Kenneth J. Allen Law Group, LLC
Valparaiso, Indiana

Matthew Boulton
Randall Juergensen
Kyle Lamar
Keller & Keller
Indianapolis, Indiana

Thomas Hastings
Jeff Oliphant
The Hastings Law Firm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Christopher A. Pearcy
Theodore J. Blanford
Hume Smith Geddes Green &
Simmons, LLP
Indianapolis, Indiana



FILED

Dec 27 2016, 9:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Terry Monday
Monday Jones & Albright
Indianapolis, Indiana

Lee C. Christie
Lance D. Cline
Cline Farrell Christie & Lee, P.C.
Indianapolis, Indiana

David W. Stewart
Stewart & Stewart
Carmel, Indiana

W. Scott Montross
Michael S. Miller
Montross Miller Muller Mendelson &
Kennedy, LLP
Indianapolis, Indiana

Scott A. Benkie
Douglas A. Crawford
Benkie & Crawford
Indianapolis, Indiana

Rodney A. Tucker
Hausmann-McNally Law Offices
Indianapolis, Indiana

Vince P. Antaki
Reminger Attorneys At Law
Cincinnati, Ohio

Geoffrey G. Giorgi
Merrillville, Indiana

Jeffrey J. Stesiak
Pfeifer Morgan & Stesiak
South Bend, Indiana

Steven E. Willsey
Indianapolis, Indiana

George Hoffman, III
Hoffman Admire & Newcomb

Franklin, Indiana

John LaDue
Timothy Curran
Ladue Curran & Kuehn LLC
South Bend, Indiana

Scott Starr
Shannon G. Starr
Starr Austen & Miller, LLP
Logansport, Indiana

ATTORNEYS FOR APPELLANTS, ALISHA
BRENNON AND THE ESTATE OF
CHRISTINA SANTIAGO

Kenneth J. Allen
Robert D. Brown
Sarah M. Cafiero
Kenneth J. Allen Law Group, LLC
Valparaiso, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

| | |
|---|---|
| Jill, Roeland, Jaymie and Jordyn Polet, et al., | December 27, 2016 |
| *Appellants-Plaintiffs*, | Court of Appeals Case No. 49A02-1510-CT-1631 |
| v. | Appeal from the Marion Superior Court |
| ESG Security, Inc., | The Honorable Timothy W. Oakes, Judge |
| *Appellee-Defendant*. | Trial Court Cause No. 49D02-1111-CT-44823 |

**Brown, Judge.**

[1] Jill, Roeland, Jaymie and Jordyn Polet, et al., appeal the trial court's grant of a motion for summary judgment filed by ESG Security, Inc. ("ESG"), and raise three issues which we consolidate and restate as whether the trial court properly granted summary judgment in favor of ESG.[1] We affirm.[2]

### Facts and Procedural History

[2] This appeal arises out of the collapse of the stage at the Indiana State Fair on August 13, 2011. The parties cite to a number of documents related to the agreement between the State Fair and Sugarland, the musical artist scheduled to perform that night. A document titled "SugarLand Production / Catering / Technical Rider" states:

> III. SECURITY
>
> A. SECURITY GUARDS

---

[1] We held oral argument on October 25, 2016, in Indianapolis. We commend counsel for their well-prepared advocacy.

[2] Alisha Brennon and the Estate of Christina Santiago (individually, "Brennon" and "the Estate," and collectively with Roeland, Jaymie and Jordyn Polet, et al., the "Appellants") also appeal, join in the arguments made by the other appellants, and raise three issues which we revise and restate as whether a final partial summary judgment on any claim for harm to the same-sex marital relationship between Brennon and Santiago was entered in favor of ESG, whether Brennon and the Estate may appeal the partial summary judgment in favor of Eric Milby and Milby Productions, Inc., to the extent it was deemed in favor of ESG, and, if so, whether the court erred in granting partial summary judgment. Because we affirm the grant of ESG's motion for summary judgment, we need not address the arguments of Brennon and the Estate relating to harm to the relationship between Brennon and Santiago.

Purchaser will provide and pay for professional security guards for protection of Artist, Artist's band and crew, from Load-In until Load-Out is completed.

B.  SECURITY MEETING

It will be necessary to hold a security meeting prior to the opening of the doors to the public.  Present at the meeting should be: Venue Representative, Purchaser, Head of Security, Tour Manager and Producer's Security Representative. . . .

C.  STAGE GUARDS

Purchaser will ensure access to the stage will be guarded by security at all times (with a minimum of 3 security people in front of the stage & 1 on each stage left and right during the performance) and only those persons designated by Producer will be allowed on stage during performance.  Security personnel will not be allowed on stage during the performance or in the dressing rooms at any time.

D.  OVERNIGHT GUARDS

If the situation requires Artist, band or crew to leave equipment at the venue overnight, security personnel will be needed from the official time the work ends until the official time work begins the following day.

E.  MEET AND GREET

2 security guards will be required by the Artists during the Meet and Greet.  Please make the specific arrangements for this at the pre-show Security Meeting.

F.  VEHICLE GUARDS

Purchaser will be liable for any damage to Artist's buses or trucks that are attributable to negligence on the part of Purchaser and/or Purchaser's Representative should such damage occur while said buses or trucks are at the performance promises [sic] during the period from Load-In until Load-Out is completed.  If

any of the vehicles must be parked away from the backstage entrance, a security person must be on call at the time and place that vehicle is parked.

G. <u>GUARD LOCATION & TIMES</u>

| | | |
|---|---|---|
| Dressing Rooms Area | 2 | from Load until Departure |
| Stage | 5 | from Doors until Patrons Clear |
| Mix Position | 2 | from Doors until Patrons Clear |
| Backstage Area | 2 | from Load In until Departure |
| Video Projection Areas | 1 per location from Doors until Patrons Clear | |

Appellants' Appendix at 2503-2505.[3]

[3] The "2011 Indiana State Fair Commission [] Rider" referenced Sugarland and the concert and provided:

THE TERMS OF THIS ISFC RIDER WILL TAKE PRECEDENCE OVER ANY CONFLICTING TERMS CONTAINED IN THE ENGAGEMENT CONTRACT AND ITS ASSOCIATED RIDERS. THIS RIDER IS INCORPORATED BY REFERENCE AS PART OF THE ENGAGEMENT CONTRACT.

---

[3] This document includes a space for signatures at the end, but it is not signed. A cover sheet is attached to the front of the document, which states:

Numerous requests for "The Sugarland Contract" have been submitted. Because of the events of August 13, 2011, the customary execution of a final written contract and payment for services was not completed. While gathering and identifying documents responsive to this request, we have compiled many documents that provide insight into the negotiation of terms and are providing the linked documents to show the terms of the negotiation and rider.

A final version of the 2010 contract has also been requested and is posted below.

Appellants' Appendix at 2502.

9. SECURITY – Indiana State Police provides a large contingent of officers to work during the Fair. There is also a detail of State Police assigned to each of the entertainment facilities; i.e. Pepsi Coliseum and ISF Grandstand. They are familiar with the State Fair audiences and shows, and are most cooperative.

*Id.* at 2524-2525.[4]

[4] A document titled "SugarLand 2011 Tour Contract Rider" provides:

XV. SECURITY
Purchaser is solely responsible for providing security in connection with the Engagement. To this end, Purchaser shall provide and pay for adequate security for the protection of all persons and property in connection with the Engagement including without limitation, Producer (and respective agents, employees, contractors and equipment) and patrons. The foregoing is in addition to any other security requirements of Producer contained in the attached Artist Production Rider.

*Id.* at 2539.

[5] The State Fair had no written contract with ESG, but it hired ESG for the purpose of fulfilling the Fair's security obligations.

[6] The bike racks that formed and created the "Sugar Pit," an area for patrons in front of the stage, was installed by Indiana State Fair Commission personnel at the request of Sugarland. *Id.* at 1351. The Sugar Pit had two access points. At

---

[4] This document contains a place for signatures for the Executive Director of the Indiana State Fair Commission and the artist/contractor/client, but it is not signed.

approximately 6:30 p.m., Cynthia Hoye, the Executive Director of the Indiana State Fair, called for an opportunity "to get decision-makers together because it appeared" to her that a weather front was coming in close to show time. *Id.* at 1234. ESG was not asked to attend the meeting nor did it attend. Around 8:00 p.m., the meeting was held, and Director Hoye and the others present decided to delay the concert. Eric Milby then asked Sugarland to delay the show, but Sugarland did not want to do so. After further discussion, Milby went back to Sugarland, again asked for a delay, and then returned to Director Hoye and indicated that Sugarland refused the second request. At no time was ESG consulted in the decision of whether or not to delay the show.

[7] ESG employees were identified by distinctive ESG uniforms, and those who were outside the Sugar Pit were to see whether anyone was standing on chairs outside the Sugar Pit and that no one was attempting to jump over the bike racks and enter the Sugar Pit. At some point, Stephen Blackburn, an ESG employee, roamed in and out of the Sugar Pit and went into it in order to assist anyone who might have had a question. Blackburn checked tickets of patrons and answered questions of people in the Sugar Pit as to where they could go to smoke or obtain something to drink. Blackburn directed some to an exit where they could go to smoke away from everyone. A couple of patrons asked Blackburn if they were going "to delay the concert, cancel the concert," and he told them that "we had not been informed yet, but since they had reserved seats right there on the front row beside the Sugar Pit, that their best bet would be to

go and stay somewhere where it was dry until they made the decision." *Id.* at 2215.

[8]  At some point, four ESG employees were standing between the Sugar Pit crowd and the stage. Adam Cesnik, an ESG employee, was to make sure that an aisle stayed clear of people wanting to stand closer and to "make sure that people, bodies, were in front of the seats not crammed together in an unsafe fashion." *Id.* at 2306-2307. Barbara Dickens, an ESG employee, talked to three or four concert guests because they were asking about the weather and if there was going to be an evacuation or not. Dickens told them: "[A]s far as I knew, there was none; and if there was to be an evacuation, they would make an announcement." *Id.* at 2601.

[9]  Around 8:40 p.m., Bob Richards gave the following announcement to the entire crowd:

> How are you? As you can see to the west, there are some clouds. We are all hoping for the best that the weather is going to bypass us, but there's a very good chance that it won't. So just a quick heads-up before the show starts, if there is a point during the show where we have to stop the show on stage, what we'd like to have you do is calmly move toward the exits and then head across the street to either the Champions Pavilion, the Blue Ribbon Pavilion, or the Pepsi Coliseum. And then once the storm passes and everything is safe, we're going to try our best to come back and resume the show, which we have every belief that that's going to happen. So please get ready because in just a couple of minutes we're going to try to get Sugarland on the stage. Have a great show.

*Id.* at 1706-1707.

[10] Indiana State Police Captain Brad Weaver was surprised by the announcement and thought the announcement was going to be that the people should evacuate in an orderly fashion. Captain Weaver then said, "We're calling this off right now." *Id.* at 1463. Before that announcement was made, the stage collapsed due to a high wind. Paul Poteet later testified that the radar images that he was looking at that evening showed the line of storms approaching Indianapolis, and one of the exhibits referenced an outflow which is an area of wind that flows out of and ahead of thunderstorms, and that an outflow is not unusual in the spring or summer. Seven people were killed and numerous persons were injured.

[11] On March 16, 2012, the estates of decedents, injured, and their families sued thirty-five defendants in ten consolidated causes of action alleging that their actions and inactions contributed to the deaths and injuries of the victims.

[12] On April 17, 2015, ESG filed a motion for summary judgment alleging that there were no genuine issues of material fact that create a duty on the part of ESG, no breach of any purported duty, and no act or omission of ESG that proximately caused the Appellants any injury or damages. On June 19, 2015, the Appellants filed a memorandum in opposition to ESG's motion for summary judgment.

[13] On August 25, 2015, the court held a hearing. On September 14, 2015, the court granted ESG's motion for summary judgment. On September 30, 2015,

the court granted ESG's motion for entry of final judgment and motion nunc pro tunc.

### Discussion

[14] The issue is whether the trial court properly granted summary judgment in favor of ESG on the Appellants' claim of negligence. When reviewing a grant or denial of a motion for summary judgment our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Goodwin et al., v. Yeakle's Sports Bar & Grill*, Inc., 62 N.E.3d 384, 386 (Ind. 2016). The party moving for summary judgment has the burden of making a *prima facie* showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* Once these two requirements are met by the moving party, the burden then shifts to the non-moving party to show the existence of a genuine issue by setting forth specifically designated facts. *Id.* Any doubt as to any facts or inferences to be drawn therefrom must be resolved in favor of the non-moving party. *Id.* Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows there is no genuine issue of material fact and that the moving party deserves judgment as a matter of law. *Id.*

[15] Generally, in order to recover on a negligence theory, a plaintiff must establish: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach. *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004). A defendant is entitled to summary

judgment by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim. *Countrymark Coop., Inc. v. Hammes*, 892 N.E.2d 683, 688 (Ind. Ct. App. 2008), *trans. denied*. "Absent a duty there can be no negligence or liability based upon the breach." *Knighten v. E. Chicago Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015) (quoting *Kroger Co. v. Plonski*, 930 N.E.2d 1, 6 (Ind. 2010)).

[16] The Appellants argue that ESG had a duty to exercise due care and points to *King v. Northeast Security, Inc.*, 790 N.E.2d 474 (Ind. 2003), *reh'g denied*. The Appellants argue that we need not conduct an analysis under *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), *reh'g denied*, regarding whether a duty exists, based upon *King*, but asserts that such an analysis would reach the same result.

[17] ESG argues that *King* is not instructive because it held that a security company can be liable for negligently carrying out its contractually assumed obligations and that, if the Appellants' argument carries the day, then the security company in *King* would have a broader duty to protect against every possible hazard on the premises such as weather related hazards, premises hazards, or other external hazards outside of its contractually assumed obligations. ESG argues that the *Webb* test must be applied.

[18]    The Indiana Supreme Court recently discussed duty in *Goodwin*.[5]  In that case, patrons injured after a shooting in a neighborhood bar sued the bar for negligence.  62 N.E.3d at 385.  The trial court granted summary judgment in the bar's favor, concluding it owed no duty to the patrons because the shooting was not foreseeable as a matter of law.  *Id.*  On appeal, the Indiana Supreme Court observed that it had previously reaffirmed that landowners have a duty to take reasonable precautions to protect their invitees from foreseeable criminal attacks in *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048 (Ind. 2003).  *Id.* at 388.  In *Paragon* the Court stated:

> Where, as in this case, the alleged duty is well-established, there is no need for a new judicial redetermination of duty.  The court's function was merely to adequately inform the jury of the applicable duty, and the jury was then to determine whether the Pub breached this duty of reasonable care to protect its invitees from foreseeable criminal attacks.

*Id.* (quoting *Bartolini*, 799 N.E.2d at 1053).  The Court held that "[t]his language understandably could be read to mean that the trial court's sole responsibility with respect to the question of duty in a negligence action is simply to instruct the jury on the question—end of story.  But such a reading is much too narrow."  *Id.*  The Court stated that "[t]he very scope of the duty a landlord owes its invitees—to take reasonable precautions to protect invitees

---

[5] We note that *Goodwin* was handed down on October 26, 2016, after the briefs were filed and after oral argument in this case.

from *foreseeable* criminal acts—necessarily calls for the court's evaluation of foreseeability." *Id.* at 388. The Court observed that in that case "foreseeability is not only a component of the proximate cause element of negligence, it is also a component of the *duty* element of negligence as well" and that "whether a duty exists is a question of law for the court to decide." *Id.* at 389. The Court held:

> In sum, because foreseeability is—in this particular negligence action—a component of duty, and because whether a duty exists is a question of law for the court to decide, the court must of necessity determine whether the criminal act at issue here was foreseeable. This is not a "redetermination" of the duty a landowner owes its invitees. Rather, the focus is on the point and manner in which we evaluate whether foreseeability does or does not exist. *See Bartolini*, 799 N.E.2d at 1053. And that point initially rests with the trial court as gatekeeper.

*Id.*

[19]     The Court observed:

> [I]n *Goldsberry v. Grubbs*, 672 N.E.2d 475 (Ind. Ct. App. 1996), [*trans. denied*,] the Court of Appeals discussed the *Webb* three-part balancing test,[6] noted its inconsistent application and results—even where the facts were very similar—and determined the reason for this anomaly was the failure to distinguish between

---

[6] In *Webb*, the Court addressed whether a doctor owed a duty to a third party injured by the doctor's patient and held that in order to determine whether a duty exists a three-part balancing test is employed: (1) the relationship of the parties; (2) the foreseeability of harm; and (3) public policy concerns. 575 N.E.2d at 995-997.

foreseeability in the context of duty and foreseeability in the context of proximate cause. The court explained:

> [T]he foreseeability component of the duty analysis must be something different than the foreseeability component of proximate cause. More precisely, it must be a lesser inquiry; if it was the same or a higher inquiry it would eviscerate the proximate cause element of negligence altogether. If one were required to meet the same or a higher burden of proving foreseeability with respect to duty, then it would be unnecessary to prove foreseeability a second time with respect to proximate cause. Additionally, proximate cause is normally a factual question for the jury, while duty is usually a legal question for the court. As a result, the foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence, while the foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.

*Id.* at 390 (quoting *Goldsberry*, 672 N.E.2d at 479 (internal citations omitted)).

[20] The Court held that, "upon further reflection, we are of the view that *Goldsberry* provides the more accurate framework for assessing foreseeability in the duty context," adopted it, and expressly disapproved of the contrary approach set forth in *Webb*. *Id.* at 391. The Court noted that in doing so it joined a number of jurisdictions that distinguish between the analytical framework used to determine foreseeability in the context of duty and that used to determine foreseeability in the context of proximate cause. *Id.* The Court held:

[A]ddressing the distinction, the Supreme Court of Appeals of West Virginia captures the underlying rationale as follows:

> [A] court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" . . . [in] more focused, fact-specific settings. . . .

*Strahin v. Cleavenger*, 216 W.Va. 175, 603 S.E.2d 197, 207 (2004) (alterations and emphasis in original (quotation omitted)). This rationale is consistent with the observation in *Goldsberry* that "the foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence, while the foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." 672 N.E.2d at 479.

But because almost any outcome is possible and can be foreseen, the mere fact that a particular outcome is "sufficiently likely" is not enough to give rise to a duty. Instead, for purposes of determining whether an act is foreseeable in the context of duty we assess "whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." *Satterfield* [*v. Breeding Insulation Co.*, 266 S.W.3d 347, 367 (Tenn. 2008)].

So, where does this leave the "totality of the circumstances" tests we endorsed in *Delta Tau Delta* [*v. Johnson*,] which requires an examination of "all of the circumstances surrounding an event, including the nature, condition, and location of the land, as well

as prior similar incidents"? 712 N.E.2d [968, 972 (Ind. 1999)]. With its broad applicability and higher burden of proof this test is certainly appropriate as a useful guide to the fact-finder in determining foreseeability in the context of proximate cause. But, precisely because this test focuses on the particular facts of the case rather than a broader inquiry, it is ill-suited to determine foreseeability in the context of duty.

*Id.* at 391-392.

[21] The Court then turned to the merits of the case with the foregoing framework in mind and held:

The broad type of plaintiff here is a patron of a bar and the harm is the probability or likelihood of a criminal attack, namely: a shooting inside a bar. But even engaging in a "lesser inquiry" we conclude that although bars can often set the stage for rowdy behavior, we do not believe that bar owners routinely contemplate that one bar patron might suddenly shoot another. To be sure, we doubt there exists a neighborhood anywhere in this State which is entirely crime-free. Thus, in the broadest sense, all crimes anywhere are "foreseeable." But to impose a blanket duty on proprietors to afford protection to their patrons would make proprietors insurers of their patrons' safety which is contrary to the public policy of this state. *See Delta Tau Delta*, 712 N.E.2d at 971. Further such a blanket duty would abandon the notion of liability based on negligence and enter the realm of strict liability in tort which "assumes no negligence of the actor, but chooses to impose liability anyway." *Cook v. Whitsell–Sherman*, 796 N.E.2d 271, 276 (Ind. 2003). We decline to impose such liability here. In sum we hold that a shooting inside a neighborhood bar is not foreseeable as a matter of law.

*Id.* at 393-394 (footnote omitted).

[22] In its conclusion, the Court reiterated:

> In a negligence action, whether a duty exists is a question of law for the court to decide. And in those instances where foreseeability is an element of duty, this necessarily means the court must determine the question of foreseeability as a matter of law. When doing so the court is tasked with engaging in a general analysis of the broad type of plaintiff and harm involved without regard to the facts of the actual occurrence.

*Id.* at 394.

[23] With *Goodwin* in mind, we turn to the Appellants' reliance on *King*. In that case, a school district entered into a contract with Northeast Security for security services at North Central High School. 790 N.E.2d at 477. The contract provided that the deputies were to perform the following duties:

> Provide exterior patrols at checkpoints for all North Central High School buildings by the means of three vehicle patrols occupied by three Marion County Special Deputies provided and employed by Northeast Security. These officers are trained personnel and understand the procedures of patrol. They will also be responsible for insuring all personnel that enter the premise[s] are possessing the proper identification. They are to be observant of any criminal activity which may occur in the parking lots and to the exterior of the building.

*Id.* Nicholas King, a student, sued the school district and Northeast Security after being injured by others while waiting for a ride home. *Id.* A panel of this court affirmed summary judgment in favor of Northeast Security. *Id.* at 478.

[24] On transfer, the Indiana Supreme Court held:

Status as a third party beneficiary has been held sufficient to create tort liability to the beneficiary on the part of a party to the contract. *Emmons* [*v. Brown*, 600 N.E.2d 133, 134 (Ind. Ct. App. 1992)]. We think, however, that it is not necessary that the plaintiff be a third party beneficiary in order to assert a claim. King's claim is a tort claim for simple negligence. Whether or not King and his fellow students acquired rights under the agreement under contract law, we think it is clear that the purpose of the agreement was to provide security services for the school. We think it equally plain that the agreement was to protect all members of the public, including students, who were properly on the premises. Under the contract, Northeast had an obligation to the District. We see no reason why the contract requiring Northeast to "[p]rovide exterior patrols[,] insur[e] all personnel that enter the premise[s] are possessing the proper identification, [and] be observant of any criminal activity which may occur in the parking lots" would not include providing safety for students. R. at 53.

The students, including King, are plainly among the persons who are properly on the premises and entitled to expect reasonable steps to be taken for their safety. The District in turn has an obligation to its students and others to take reasonable steps for their safety. We see no reason why negligent failure to carry out these assumed responsibilities should not give rise to liability to students who are injured as a result. There may be significant issues as to negligence and causation that remain in this case. But at this summary judgment stage, there is nothing inherent to the students' status or relationship to the District or Northeast that prevents recovery. Nor is the class of persons who are properly on school premises so remote that liability to them should be precluded as a matter of law for injuries resulting from negligent performance of assumed responsibilities.

*Id.* at 485-486.

The Indiana Supreme Court also held that "those specifically engaged in providing services undertaken for security services may well be found to have a higher standard of care than the public at large, whether or not they are on notice of specific activity at the site." *Id.* at 487 (citing *Rosh v. Cave Imaging Sys., Inc.*, 26 Cal. App. 4th 1225, 32 Cal. Rptr. 2d 136, 139 (1994) (establishing the requisite standard of care of a security guard company through expert testimony), *reh'g denied*, *review denied*;[7] *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 170-171 (Minn. 1989) (noting that a security firm hired by a commercial parking ramp owner has a "duty to use that degree of care which a reasonably prudent professional security firm would use")).

We do not find *King* determinative of the outcome in this case. We cannot say that *King*, which involved a security firm's duty to protect a student on school grounds from a physical assault and a contract requiring the security firm to be observant of any criminal activity, requires that we find that a duty exists in the present case. The duty of Northeast in *King* to prevent injuries to students from other students is fundamentally different from a duty a security firm could have with respect to a stage collapse. The agreement here called for security personnel at various times and locations, none of which suggest ESG's agreement contemplated a duty with respect to a stage collapse. The agreement here did not contain any provision which could place protecting patrons from a

---

[7] The court in *Rosh* addressed a situation in which a manager terminated an employee, and the employee returned to the premises and shot the manager. 26 Cal. App. 4th at 1229.

stage collapse caused by wind within ESG's scope of work. We also note that ESG was not involved in the decision making process regarding the weather front. *King* is clearly distinguishable. *See Star Wealth Mgmt. Co. v. Brown*, 801 N.E.2d 768, 774-775 (Ind. Ct. App. 2004) (holding that *King* did not require reversal of summary judgment granted to Lloyd Brown d/b/a A.S.A.P. Investigation and Security Services and distinguishing *King* in part by stating "[i]n its discussion of the negligence claims against the district and against Northeast, our supreme [court] began by citing the long-standing recognition that school authorities owe a duty to exercise reasonable care and supervision for the safety of the children under their control," and that the *King* Court's "subsequent discussion of Northeast's duty was arguably linked to the duty of the school with which it had contracted").

[27] Here, foreseeability plays a role in the analysis of duty. Indiana has not addressed whether a security company has a duty related to stage collapses or weather. At least one case outside Indiana has addressed whether a security provider has a duty to warn regarding weather and specifically high winds, and held that it does not. *See Stabnick v. Williams Patrol Serv.*, 390 N.W.2d 657, 658-659 (Mich. Ct. App. 1986) (affirming the grant of summary judgment to a security provider and holding that "[t]he key here is whether the gusty wind was a foreseeable danger about which the defendant had a duty to warn the plaintiff," and that "[w]ind is a natural unpredictable condition. Whether wind

becomes dangerous is unpredictable and unforeseeable. Thus, there can be no duty to warn the plaintiff of some unforeseeable danger."), *appeal denied*.[8]

[28] The Appellants cite *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165 (Minn. 1989), and *Vanesko v. Marina Dist. Dev. Co., LLC*, 38 F. Supp. 3d 535 (E.D. Pa. 2014), for the idea that a security firm has a duty to exercise due care. These cases do not specifically address the issue of a duty related to stage collapses or weather. *See Erickson*, 447 N.W.2d at 166 (addressing whether an operator of a commercial parking ramp owes a duty to a ramp customer to protect her from a trespassing rapist and holding that whether a duty is imposed depends on the foreseeable risk involved); *Vanesko*, 38 F. Supp. 3d at 537 (addressing injuries of a concertgoer that occurred when something or someone struck him from behind and holding that it was reasonable, fair, and in the interest of public

---

[8] Some courts have addressed the duty to warn of weather generally. *See Caldwell v. Let the Good Times Roll Festival*, 717 So.2d 1263, 1273 (La. Ct. App. 1998) ("Certainly, the fact of the extremely strong and turbulent winds accompanying the storm, combined with the fact that those attending the public festival were sheltered underneath a tent which did not withstand the power of the winds, combined to create some danger to the public crowd. Likewise, those who gratuitously or for remuneration produce a public festival owe some duty to the public to provide, as is urged here, some 'safety and security,' but that duty, being owed to the public by all who serve the public (fire and police personnel), may not extend to protect the public against all possible risks of injury, especially when the injury stems from an extraordinary, rare and reasonably unexpected weather occurrence or circumstance."), *writ denied*; *Dykema v. Gus Macker Enterprises, Inc.*, 492 N.W.2d 472, 475 (Mich. Ct. App. 1992) (addressing a situation in which a plaintiff, while running for shelter, was struck by a falling tree limb and paralyzed at a basketball tournament, affirming an order granting defendants' motion for summary disposition, and holding that "[e]ven if plaintiff had succeeded in establishing that a special relationship existed between himself and defendant, we are unable to find precedent for imposing a duty upon an organizer of an outdoor event such as this basketball tournament to warn a spectator of approaching severe weather," that "such a duty has not been recognized in Michigan, and, apparently, no other jurisdiction has constructed one," and observing that the Tennessee Supreme Court recently held that a state-owned golf course does not owe, as part of its duty of reasonable care, a duty to warn its patrons of the dangers of lightning), *appeal denied*.

policy to impose a duty on a security company to protect a concertgoer from foreseeable injury). Thus, we do not find these cases instructive.

[29] With the *Goodwin* framework in mind, we observe that the broad type of plaintiff here is a patron of an outdoor concert, and the harm is the probability or likelihood of a stage collapse caused by a strong wind. We do not believe that security firms routinely contemplate that a stage might collapse. Indeed, Dr. Randall Davidson, the Appellants' expert, testified that it would be reasonable for a security company like ESG at an event like this to expect that the stage was properly constructed and inspected and that ESG did not have any knowledge or reason to believe that the stage could not withstand an Indiana storm. In sum, we hold that a stage collapse due to high wind is not foreseeable as a matter of law. Accordingly, we cannot say that ESG had a duty relating to the stage collapse.[9]

## *Conclusion*

[30] For the foregoing reasons, we affirm the trial court's grant of summary judgment in favor of ESG.

[31] Affirmed.

Robb, J., and Mathias, J., concur.

---

[9] Appellants do not argue that ESG breached any duty following the stage collapse.