Filed 3/25/22

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BOWE CLEVELAND,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TAFT UNION HIGH SCHOOL DISTRICT et al.,<br><br>    Defendants and Appellants. | F079926<br><br>(Super. Ct. No. S1500CV279256)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  David Lampe, Judge.

Herr Pedersen & Berglund, Leonard C. Herr, Ron Statler; Pollak, Vida, & Barer and Daniel P. Barer for Defendants and Appellants.

Rodriguez & Associates, Daniel Rodriguez, Joel T. Andreesen, Chantal A. Trujillo; Esner, Chang & Boyer, Andrew N. Chang, Stuart B. Esner and Kevin K. Nguyen for Plaintiff and Respondent.

-ooOoo-

Defendant Taft Union High School District (District) appeals from a judgment entered after a jury found District's employees 54 percent responsible for injuries sustained by plaintiff Bowe Cleveland when another student shot him in the stomach with

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III. of the Discussion.

a shotgun.  This allocation of fault and the jury's findings as to damages resulted in a judgment holding District vicariously liable for approximately $2 million.  District filed a motion for judgment notwithstanding the verdict, which the trial court denied.

We publish this opinion because District's contention that all members of its threat assessment team are immune from liability pursuant to Government Code section 855.6[1] has not been addressed in a published decision.  Section 855.6 provides that neither a public entity nor its employees are "liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a … mental condition that would constitute a hazard to the health or safety of himself or others."  We conclude that the specific acts and omissions identified by plaintiff's expert as below the standard of care for conducting a threat assessment are properly characterized as administrative and not as a mental examination.  Thus, those negligent acts and omissions fall outside the scope of the section 855.6 immunity.

The unpublished part of this opinion addresses District's contention that there is no substantial evidence of a causal link between plaintiff's injuries and the negligent conduct of a campus supervisor in failing to report a conversation about other employees who were afraid of the shooter and had escape plans.  We conclude substantial evidence supports the jury's finding that the campus supervisor's failure to report information, like the threat assessment teams' many other failures to communicate information, was a substantial factor in causing plaintiff's injuries.

We therefore affirm the judgment.

---

[1]     Unlabeled statutory references are to the Government Code.

## FACTS

In January 2013, 16-year-old high school student Bryan O. shot plaintiff Bowe Cleveland, another student, in the stomach with a shotgun near the start of their first period science class at Taft Union High School.

When Bryan was in eighth grade, he moved from Tennessee to California with his mother and brothers. In the fall of 2010, Bryan started attending the District's high school.

In March 2011, Bryan was involved in a fight with several classmates during a physical education (P.E.) class. After the fight, Bryan told assistant principal Rona Angelo that he had been "T-bagged" during the incident. Bryan's mother met with Angelo to discuss the incident, but Angelo did not tell her that Bryan had reported being "T-bagged." Bryan was suspended for three days for his involvement in the incident.

Before this incident, Bryan's mother had reported to Angelo that Bryan told her he had complained to the P.E. teacher about bullying and the teacher told Bryan to "man up." Angelo's response was that "boys will be boys." Bryan's mother was unsatisfied with Angelo's response and went to see superintendent Mark Richardson in his office. She described Richardson's response as dismissive, saying he would "look into it."

### The Bus Incident

On Saturday, February 25, 2012, Bryan went on a field trip to Universal Studios with other students in an accelerated reading program. The three chaperones for the trip were librarian Kathy McLaughlin and library media technicians Dianne Kaszycki and Kelly Federoff. On the bus ride back, Bryan and four other students had a conversation that was overheard to Kaszycki and Federoff.

The following Monday, Kaszycki filed an incident report describing the conversation as follows. Bryan told a classmate that when he lived in Tennessee he had thought about shooting someone at school because he was being picked on. The classmate told Bryan that he could not get away with anything because he would do

3.

everything in his power to make sure it did not happen and the armed officer at the school would shoot Bryan.  During the conversation, Bryan mentioned that he had only dreamt about it and the other student replied that dreaming is the first stage of doing something like that.  Bryan also described bringing gasoline to school and blowing up the auditorium.  When two girls asked Bryan if he would shoot them, Bryan said no.  When a third girl asked, he said probably.  At the end of the report, Kaszycki stated that the situation was very disturbing and stressful and that she was very concerned for the safety of the students, staff, and Bryan.

Federoff also prepared an incident report.  Federoff heard Bryan describing how he could blow up the auditorium and telling another student he could shoot or take out more than 50 students before anyone could stop him.  Differing from Kaszycki's report, Federoff's report stated that when the last girl asked Bryan if he would shoot her, "Bryan looks straight at her and tells her 'Yes I would.' "  Federoff also reported Bryan saying he had dreams about shooting people and telling the other students that he knew they had thoughts about shooting people; the other students told Bryan they did not have such thoughts.  Federoff reported that "Bryan said 'Don't you just have those days when it gets so bad that you just can't take in anymore and you want to start shooting people?' "  Students also completed incident reports about what happened during the bus ride.

*Threat Assessment Initiated*

On Monday, February 27, 2012, Kaszycki met with Angelo, told Angelo what she had overheard, and expressed her concern for the safety of students and staff.  Angelo also expressed concern and told Kaszycki she was going to go through her process of investigating the situation.  As part of that process, Angelo decided to start a threat assessment.

Later that Monday, Angelo suspended Bryan for five days for violating an Education Code provision prohibiting threats about causing physical injury to another

4.

person. Bryan and his older brother signed a written notice acknowledging they had been told the reason for the suspension. Bryan's mother was notified by telephone.

As part of the threat assessment, Angelo met with school psychologist Mark Shoffner. Shoffner obtained his credential as a school psychologist in 1985. Shoffner did not have an administrative credential and, therefore, was not authorized to discipline students. He first became involved in threat assessments of students in 2000, shortly after Columbine. In August 2006 until 2017, Shoffner worked for District. He estimated that he had done more than 150 threat assessments while at District. Shoffner's role in a threat assessment was to look at the mental health information available and meet with the student to determine what the student's intent was and whether the student understood why others might have been scared by what the student said or did. Shoffner also stated that there were times when (1) he would request the assistance of a school resource officer[2] or (2) a determination was made that the officer should be part of the assessment team. Factors used to determine whether to involve a school resource officer included whether a weapon was involved or a threat to use a weapon was made, whether there was an assault, and whether there was a plan being put in place, such as a hit list.

As part of the threat assessment, Shoffner contacted Bryan's guidance counselor and asked her if she had any concerns about Bryan's academic performance or otherwise. He learned she had none.

On February 28, 2012, Shoffner met with Bryan and interviewed him about the incident on the bus. Shoffner's handwritten notes from the meeting were admitted as an exhibit at trial. During that meeting, Bryan described the discussion the students had on the bus, saying it turned into a discussion about bullies and what the student would do about bullies. Bryan described being asked a hypothetical question about a hit list,

---

[2]    A school resource officer is a police officer with special training to work in school and they perform preventative and enforcement functions. (See *Peterson v. Pollack* (Fla.App. 2020) 290 So.3d 102, 104 [sheriff's deputy served as school resource officer].)

5.

followed by other students asking whether they would be on the list. Bryan said he told the student who asked "no," except he paused before answering the last student. Bryan also told Shoffner about the dream he had when he was living in Tennessee that involved locking the bullies in a gym and shooting them. Bryan also said it was part of a dream and he would never do anything like that.

On February 29, 2012, a female student completed an incident report about a drawing she saw on Bryan's desk during history class. The drawing showed big stick figures with machine guns shooting smaller stick figures and was titled "The Playground." The smaller stick figures were laying on the playground and had red blood marks on their heads. The female student grabbed the drawing and gave it to the history teacher. She spoke with Angelo about the incident twice, once on the day it occurred and again a few weeks later. The student told Angelo that she felt scared and disturbed by the drawing. Angelo asked if the student felt threatened for her life and the student answered "yes." Angelo then told the student that Bryan was getting help from the school counselor and not to worry because it was getting taken care of.

Two male students also completed incident reports dated February 29, 2012. One report stated the student had heard Bryan had a hit list and some of the student's friends were on it. The report also stated Bryan said he was going to kill a certain Black student. The student testified that Angelo told him his name was on Bryan's hit list and asked him if he knew why it might be there. The student explained that it might have been because his friend got into a fight with Bryan. The other incident report stated that Bryan had said he was going to kill two students and identified one of them as the Black student named in the other incident report.

At some point, a parent of a student at the school met with Angelo in her office to discuss the hit list. The parent stated he was concerned for his son and was scared. Angelo told him not to worry, that she had it handled, the cops would take care of it, and everything was okay.

School resource officer Greg Collins[3] searched Bryan's home because of the talk about shooting other students and about a hit list. Collins found no firearms or hit list.

Shoffner also met with Bryan's mother as part of the threat assessment. She told Shoffner about Bryan's dream. Bryan's mother also confirmed Bryan's statement that there were no weapons in the house. Bryan's mother testified that during the meeting she was not told about or shown the written reports made by students and staff about the things Bryan had said on the bus.

Shoffner prepared a "Threat Assessment Report" that indicated he had reviewed the "School Cumulative File" and listed other sources of information, including Bryan, his mother, his guidance counselor, and the three chaperones from the field trip. The report categorized the level of risk as being a four on a scale of one to five. The first category is for "[h]igh violence potential; qualifies for immediate arrest or hospitalization." The fourth category is for "[i]nsufficient evidence of violence potential, sufficient evidence for the unintentional infliction of emotional distress upon others." The threat assessment report recommended Bryan return to school with the stipulation that he have a weekly meeting with a school counselor or psychologist for a month. The report was signed by Shoffner and Angelo.

On March 1, 2012, Richardson sent an e-mail to faculty and staff briefly describing the situation that occurred on the bus, noting the student's home had been checked for weapons. Richardson stated the threat assessment team had completed an assessment and cleared the student to return to school. Richardson also referred to a student making comments about a hit list, stated "there is no truth to these comments," and also stated "[w]e have addressed the comment with this student and are working

---

[3]    Collins worked for the Kern County Sheriff's Department and was assigned to Taft Union High School. He described a school resource officer as an officer assigned to a district or school location who deals with any law enforcement, truancy, and similar matters. Collins stated school resource officers usually are in uniform and carry their firearm.

through that situation as well." Richardson mentioned comments about a hit list on social media and stated "[w]e appreciate your assistance in helping squash the rumors."

In March 2012, after Bryan served his suspension, he and his mother signed an attendance/behavior/academic contract with District covering the remainder of the school year. In addition to standard clauses, the contract stated that Bryan would be subject to random searches.

On March 7, 2012, Bryan's mother met with Shoffner and other District employees as part of the annual review of Bryan's individualized education program (IEP). She received the IEP report and signed it. The IEP report concluded that, based on the current assessment, Bryan no longer needed special education or related services, which his mother felt was good news.

A few days after Bryan returned to school, another student reported that in English class Bryan appeared to make a stabbing motion when he returned from the pencil sharpener. Angelo asked Shoffner to talk to Bryan about the matter. Shoffner testified that Bryan said he was twirling the pencil in his fingers, it slipped, and he grabbed it. When the other student asked Bryan what he was doing, he said that he was practicing. Shoffner suggested to Bryan that, as far as strategy, he needed to be doing everything by the book and ended the discussion. Bryan's mother was not informed of the pencil incident or of the fact that the discipline log noted another student had messed with Bryan's backpack and upset him. She also was not informed that Bryan's discipline record indicated truancies on April 12, 2012, and April 16, 2012.

A female student who was a member of the chess club testified that after Bryan returned to school, she asked him about the bus incident. Bryan told her that it was not serious, he was just trying to make people afraid of him, and he did not actually have a hit list. The student thought something "was a little fishy" in what Bryan told her and went to Angelo. Angelo told her that Bryan had already been suspended and, at that point, "he was just blowing smoke." The student testified that she went to Angelo on other

8.

occasions when Bryan did something disturbing or when she felt uncomfortable and, the more she went to Angelo, the more she realized that Angelo was not taking it seriously and, therefore, she probably should not take it seriously either.

The female student also testified that after the bus incident and before the end of her junior year, Bryan presented her with a hit list on a piece of paper. The list contained only two names, plaintiff's and another student's.[4] The student told her mom and brought it up with Angelo. The student testified: "She said, though, that she had already taken care of the hit list incident and that was that." The student's mom told her that because she did not have a physical copy of the list, it was hearsay, though the mom was concerned Bryan actually had a list.

On November 8, 2012, Kaszycki witnessed Bryan in the library tell the female student from the chess club that if he did not get out of geometry, something drastic would happen. After Bryan left the library, Kaszycki called security and spoke with Fields; she believed Fields picked Bryan up and took him to the office. The next day, Kaszycki completed an incident report stating that when Bryan made the statement, he had a look on his face she had never seen before and it scared her. Kaszycki also spoke with Angelo about the incident.

In December 2012, Bryan's older brother obtained a 12-gauge Winchester pump-action shotgun that he used for skeet shooting. The gun was stored on a shelf in the bedroom he shared with Bryan. The ammunition and clay skeets were stored in the garage.

---

[4]     The student testified she had never observed Bryan being bullied and stated she believed that plaintiff was not intentionally bullying Bryan, but that Bryan took it the wrong way. The student described plaintiff as "this big teddy bear of a guy" who would often tease and try to be friendly with people. She did not consider plaintiff's behavior toward Bryan to be bullying. She explained that "Bryan wasn't the kind of person that took well to that kind of behavior, and [plaintiff] didn't understand that."

On Friday, December 14, 2012, Bryan prepared an incident report stating he went outside his seventh period room to take a test and when he returned some of his books were gone and his backpack had been hidden under the teacher's desk. The report contains a note dated December 17, 2012, stating the books were found.

Also in December 2012, Angelo called a female student into her office to discuss tweets the student had posted about Bryan. Angelo had the student complete and return an incident report. During the conversation, the student told Angelo things about Bryan and why the student was afraid of him and felt he was going to bring a gun to school. Those things included (1) Bryan bringing a knife to school their freshman year and pulling it on another student, (2) Bryan saying he had watched serial killer movies and thought of plaintiff, (3) Bryan coming up to her and telling her that she should start punching and kicking plaintiff, and (4) Bryan having a hit list the year before. The student testified that Angelo responded to the comment about the hit list by saying it had been investigated and taken care of.

On January 9, 2013, the female student who was a member of the chess club testified that Bryan told her and all of his friends not to come to school the next day because something bad was going to happen. She testified that he said that to her before school in the library, during lunch, and again after school. Just before the student's mom picked her up, Bryan told her out of the blue that he was going to kill plaintiff. She did not think Bryan would actually do it.[5]

*The Shooting*

On January 10, 2013, Bryan took the shotgun to school and shot plaintiff during their first period science class. Campus supervisors Kim Fields and Mary Miller were in

---

[5]    Earlier in her senior year, the student had gone to Angelo to report an incident with Bryan. The student stated that she had been dismissed, which was not unusual because she had been dismissed several times before, and "I just was like, well, if she's not going to listen to me, then there isn't anything I can do, and that was that."

the attendance office when a call came in about a loud noise in the science building. Fields and Miller immediately drove a golf cart to the science building. They went to the second floor and found Bryan in a classroom with a shotgun. Fields talked Bryan into putting the gun down without another shot being fired. Fields took Bryan to an adjoining room and put him spread eagle on the floor. Fields asked Bryan what happened, and Bryan said he had been picked on every day of his life, he woke up that morning, decided he could not take it anymore, and just snapped. Bryan said he had shot plaintiff and named another student who was going to be next.

Law enforcement officers arrived and took Bryan away. After the shooting, the chief of Taft's police department had a conversation with Fields about Bryan and the incident. The chief's and Fields's testimony about that conversation is described in part III.B.2. of this opinion. Bryan was charged with two counts of attempted murder with enhancements, pleaded no contest, and was sentenced to a stipulated term of 27 years, four months in prison.

*The Assessment Team*

In 2012, there were not any federal or state rules or regulations in place mandating how a school's threat assessment was to be conducted. One of the resources relied upon by Shoffner in conducting the threat assessment of Bryan was a publication authored by Dewey Cornell and Peter Sheras and titled "Guidelines for Responding to Student Threats of Violence." (Some capitalization omitted.)

At Taft Union High School, the core of a threat assessment team usually consisted of three members and sometimes included a fourth. The team leader usually was the assistant principal. The other members were the school resource officer (i.e., a law enforcement officer assigned to the school) and the school psychologist. Once the team reached its recommendation, it usually included the principal in making a final decision.

Angelo was the leader of the threat assessment team that considered the hazard presented by Bryan. As assistant principal, Angelo's duties included discipline, handling

11.

suspensions, recommending expulsions, overseeing the accuracy of attendance reporting, and teacher evaluations. Shoffner testified that Angelo would pursue leads from an investigative point of view, would identify witnesses and gather their statements, and would meet with him to discuss what they had found and whether further leads needed to be explored. Shoffner testified it was not Angelo's role to make a mental health evaluation of the person being assessed and it was his role "to do the mental health component." In fulfilling that role, Shoffner always would meet with the student accused of making the threat and their parent to get the student's side of the story and learn the student's intent.

Marilyn Brown served as interim principal from September 2012 through June 2013. Brown supervised Angelo, who oversaw discipline and campus security. Shoffner testified that "Brown may have been part of the discussions and just in looking at setting up [the threat assessment] team." When Brown was asked how often she met with Angelo regarding security or safety issues at the school during her tenure as interim principal, Brown stated they met regularly but could not estimate how many times the meetings addressed threats or security issues. As for her awareness of Bryan's situation, Brown testified that when Richardson left in September 2012, he told Brown that Bryan had been suspended pending an investigation into reports of threats, that it had been investigated, that there was no threat, and that the threat assessment had been done. Brown also testified that Shoffner told her, as a matter of information, that it was alleged Bryan had made threats to other students, it had been investigated, there was no basis for the claims, and the threat assessment had been completed. Brown stated Shoffner or Angelo advised her that a school resource officer had been sent to Bryan's home to look for weapons and a hit list. Brown stated that she never had personal contact with Bryan.

Collins, the school resource officer who searched Bryan's home, retired near the end of March 2012. In that capacity, he reported to Angelo, though she did not tell him how to perform his law enforcement duties. Collins never spoke with Bryan after the

12.

search of his home. Collins testified that he had participated in some threat assessments at the school, but he did not participate in any threat assessment of Bryan.

Angelo testified that there came a point when she, Shoffner and Richardson discussed what to do about Bryan after the bus incident. They had checked with the school resource officer and learned Bryan had not broken any laws, determined Bryan had not made a direct threat, and, based on the psychological part of the assessment, decided Bryan could return to campus rather than initiating expulsion proceedings against him. Richardson testified that he never informed the faculty or staff that Bryan had made threats on the bus and never told teachers to keep an eye on Bryan because of the comments Bryan had made.

## PROCEEDINGS

In April 2013, plaintiff filed a personal injury complaint against District, Superintendent William McDermott,[6] Principal Brown and Assistant Principal Angelo. The complaint alleged causes of action for general negligence, premises liability based on a dangerous condition of public property, and negligent infliction of emotional distress. Plaintiff did not name Bryan as a defendant.

Defendants' answer included a general denial and asserted several affirmative defenses, including immunity pursuant to sections 820.2 and 855.6. Defendants also filed a cross-complaint for indemnity and apportionment of fault against Bryan, his mother, and his older brother.

_Motion in Limine_

Before trial, defendants filed several motions in limine. The third motion in limine was based on the section 855.6 immunity and sought an order precluding evidence, opinion or argument about the sufficiency, accuracy or frequency of District's threat assessment. In response, plaintiff argued that the immunity is very specific, only

---

[6] The trial court granted a motion for directed verdict in favor of McDermott and plaintiff concedes there is insufficient evidence to support a claim against him.

13.

applied to physical and mental examinations, and did not extend to many of the acts and omissions of the threat assessment team, such as the failure of members to share information.

The trial court granted the motion in part, concluding liability could not be predicated "on a criticism of Shoffner in his role as a psychotherapist in examining [Bryan] and predicting or warning of [his] behavior." The court also concluded there was a range of things, not covered by the immunity, that the defendants could have done that the jury might find breached the standard of care.

*Expert Testimony*

During the trial, each side presented expert testimony on the effectiveness of District's threat assessment of Bryan. District's expert was Dr. Kris Mohandie, a clinical police and forensic psychologist. Plaintiff's expert, Dr. John Reid Meloy, a forensic psychologist, testified that a threat assessment process has three stages. The first is to identify the threat. The second is to assess the threat. The third is to manage the threat.

Meloy gave his opinion that the threat assessment conducted by District did not meet the standard of care because (1) the threat assessment was not carried out by the team collectively; (2) the school resource officer (i.e., the law enforcement officer assigned to the school) should have been a core member of the team; (3) the threat assessment team failed to communicate amongst themselves about Bryan; (4) the threat assessment team failed to adequately communicate with Bryan's parent; (5) the threat assessment team failed to recommend counseling to Bryan's parent as an intervention technique; and (6) the threat assessment team did not continue to collectively monitor Bryan and reassess the safety plan. Meloy also testified that, in his opinion, if the threat assessment team had operated within the standard of care, it was more likely than not that the shooting would have been prevented.

Meloy's description of instances of poor communication included the fact that Angelo was the only team member who knew about (1) Bryan's March 2011 altercation

14.

in P.E. class; (2) Bryan's drawing titled "The Playground"; (3) Bryan's threat to kill a Black student; and (4) Kaszycki's November 2012 incident report about Bryan's comment about getting out of geometry or "something drastic" would happen. Meloy also identified instances where Angelo and Shoffner were the only ones who knew the relevant information.

*Jury Instructions*

Based on CACI No. 400 (Negligence – Essential Factual Elements), the court instructed the jury that plaintiff's negligence claim relating to the failure to supervise the school premises required him to prove (1) Angelo, Richardson, Fields and/or Brown were negligent in failing to supervise the school premises; (2) plaintiff was harmed; and (3) the negligence of Angelo, Richardson, Fields and/or Brown was a substantial factor in causing plaintiff's harm. Based on CACI No. 430, the jury was instructed on the substantial factor test for causation. The jury was also instructed on the basic standard of care and the standard of care for school administrators and employees. The latter instruction stated that such a person "is negligent if he or she fails to use the skill and care that a reasonably careful school administrator/employee would have used in conducting threat assessment or threat management" and that the jury must determine that level of skill and care "based only on the testimony of the expert witnesses, including … Angelo and … Shoffner, who have testified in this case." Other instructions were based on CACI Nos. 406 (Apportionment of Responsibility), 428 (Parental Liability [Nonstatutory]), 431 (Causation: Multiple Causes), and 433 (Affirmative Defense Causation: Criminal Act As Superseding Cause).

A special jury instruction regarding the immunity under section 855.6 was given. It stated: "[N]either a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a … mental examination, or to make an adequate … mental examination, of any person for the purpose of determining whether such person has a … mental condition that would constitute a

15.

hazard to the health or safety of himself or others." Another special jury instruction stated that guidelines do not create a mandatory duty of care.

*Closing Arguments*

During closing argument, plaintiff's counsel asserted that Angelo should be held 49 percent responsible because she was the leader of the threat assessment team, and she called the shots and had all the information. He also addressed the immunity for mental examinations in arguing the jury should hold Shoffner 15 percent responsible: "Why? Among other things – oh, let me make it perfectly clear for you. Mr. Shoffner wears two hats. One hat that he wears he is the school psychologist, okay. We're not being critical of him as to whether or not he tested or didn't test. That's off limits. But as part of the threat assessment team, as an administrator, that's a different story. That's what we're being critical of. So we're not criticizing him as to whether he did the test or didn't do the test. The evidence was that he didn't, but that doesn't matter. It's communication, threat assessment team."

The lack of communication also appeared in counsel's argument about Superintendent Richardson's responsibility. Counsel stated that Richardson was "supposed to be in charge. He's the one that says squash the rumors instead of see something, say something." Counsel also argued that Fields had information about employees with escape plans and did not relay it to Angelo despite security being part of his job.

District's counsel also addressed the section 855.6 immunity in his closing argument, stating: "I want to tell you about a very important jury instruction the Judge is going to give you, an instruction that was not mentioned by the Plaintiff. This instruction is critical for your analysis. And that's Government Code Section 855.6. And if you excuse me, I'm going to read it to you, because I think it's so important. It provides that neither a public entity such as Taft Union High School District nor a public employee such as Mark Shoffner, Rona Angelo, for example, acting within the scope of their

16.

employment, that means while they're acting as school administrators[,] Mark Shoffner as a credentialed school psychologist, Rona Angelo as a credentialed assistant principal, is liable for injury caused by failure to make a mental examination or to make an adequate mental examination of any person for the purpose of determining whether such person has a mental condition that would constitute a hazard to the health or safety of himself or others." Counsel argued the instruction was critical to the jury's analysis of what Shoffner did and what Angelo did in relying upon Shoffner's work, stating that what they did was to determine if Bryan had a mental condition that made him a threat or hazard to himself or others. Counsel asserted if that was what the jury found Angelo and Shoffner did, then section 855.6 would apply and neither would be responsible for plaintiff's injuries. In going through the special verdict form, District's counsel argued the jury should find Bryan 100 percent responsible for plaintiff's injuries. He also presented an alternate view that apportioned 10 percent of the responsibility to Bryan's mom, 5 percent to Bryan's brother, and the remainder to Bryan.

*Jury's Verdict*

The jury returned its verdict on July 17, 2019. The special verdict form addressing liability included 10 questions asking whether Angelo, Shoffner, Brown, Fields, Richardson,[7] Bryan, Bryan's mother, and Bryan's brother were negligent and, if so, whether that negligence was a substantial factor in causing harm to plaintiff. The jury found that each individual was negligent and found that negligence was a substantial factor in causing plaintiff's harm. The special verdict form also asked what percentage of responsibility for plaintiff's harm the jury assigned to each of the negligent individuals. The jury allocated 27 percent to Angelo, 19 percent to Shoffner, 4 percent to Richardson, 3 percent to Brown, and 1 percent to Fields. As a result, District employees were found

---

[7] Shoffner, Fields and Richardson were not named as defendants but were included in the special verdict form because District, a named defendant, was vicariously liable for their negligence. (See § 815.2, subd. (a).)

17.

to be 54 percent responsible for plaintiff's harm. The jury allocated the other 46 percent of the responsibility to Bryan (27 percent), his mother (10 percent), and his brother (9 percent).

The jury found plaintiff's past noneconomic damages were $1.4 million and his future noneconomic damages were $2.4 million for a total of $3.8 million in damages. Based on the jury's allocation of fault and its findings as to damages, the trial court entered a judgment for $2,052,000 against District based on its employees' negligence.

*Postjudgment Motion and Appeal*

In August 2019, District moved for judgment notwithstanding the verdict, asserting all the members of the threat assessment team were shielded from liability by the section 855.6 immunity. District also asserted there was no evidence of how Fields's knowledge about two employee's fears of Bryan caused plaintiff's injuries.

At the hearing on the motion, the court announced its tentative ruling, heard counsel's arguments, and denied the motion. The court determined that the evidence was more than sufficient to support the jury's decision that there was negligence that extended beyond the immunity afforded by section 855.6. The court also determined that the evidence regarding Fields's failure to report a conversation about employees who were afraid of Bryan and had escape plans was sufficient to support the jury's finding of causation and allocation of 1 percent of the responsibility to Fields.

In September 2019, District appealed from the judgment and the denial of its motion for judgment notwithstanding the verdict.

**DISCUSSION**

District raises two issues on appeal. First, does the immunity provided by section 855.6 apply to all the negligent acts and omissions of Angelo, Shoffner, Brown, and Richardson? We conclude the immunity does not cover all the assessment team's negligence. Second, is there sufficient evidence to support the jury's finding that Fields's

18.

failure to report information was a cause of plaintiff's harm?  In the unpublished part of this opinion, we conclude substantial evidence supports the jury's causation finding.

I.       SCHOOL SAFETY—AN OVERVIEW

Our discussion of the relevant law begins with an overview of the principles addressing a school's responsibility for the safety of students and staff.  These principles provide context for our analysis of the immunity provided by section 855.6 for mental examinations and its application to the facts of this case.

A.       Constitutional Provisions

The California Constitution states that "the People find and declare that the right to public safety extends to public and private primary, elementary, junior high, and senior high school, … where students and staff have the right to be safe and secure in their persons."  (Cal. Const., art. I, § 28, subd. (a)(7).)  In addition, the California Constitution's list of collectively held rights—that is, rights shared with all Californians—includes the right to safe schools:  "All students and staff of public primary, elementary, junior high, and senior high schools, and community colleges, colleges, and universities have the inalienable right to attend campuses which are safe, secure and peaceful."  (Cal. Const., art. I, § 28, subd. (f)(1).)

These constitutional provisions, according to our Supreme Court, express "a 'fundamental public policy favoring measures to ensure the safety of California's public school students.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 628 (*Regents*), quoting *C.A v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 870, fn. 3 (*William S. Hart*).)  The provisions, however, do not create a private right of action.  Instead, they have been cited to support the Supreme Court's determinations that "a school district and its employees have a special relationship with the district's pupils" and that "the duty of care owed by school personnel includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally."

19.

(*William S. Hart*, *supra*, at pp. 869–870.)  In this context, "third parties" include other students, nonstudents, and teachers.  (*Id*. at p. 870.)

Our Supreme Court has addressed the goal of providing a safe school environment outside the tort context.  In 2004, the court considered a juvenile court's determination that a 15-year-old student's poem constituted a criminal threat in violation of Penal Code section 422.  (*In re George T.* (2004) 33 Cal.4th 620, 629.)  The court concluded the student's "poem did not constitute a criminal threat" and reversed the judgment.  (*Id*. at p. 639.)  In *George T.*, the court mentioned the apparently competing interests of (1) a school protecting the safety of its students and faculty and (2) students' right to engage in creative expression and then stated:  "Following Columbine, Santee, and other notorious school shootings, there is a heightened sensitivity on school campuses to latent signs that a student may undertake to bring guns to school and embark on a shooting rampage.  Such signs may include violence-laden student writings."  (*Id*. at p. 639.)  The court expressed the view that ensuring a safe school environment and protecting freedom of expression were not necessarily antagonistic goals.  (*Ibid*.)

B.     Statutes Addressing School Safety and Violence Prevention

In 2013, when plaintiff was shot, two legislative school safety and violence prevention programs were in effect.  (Ed. Code, former §§ 32228–32228.5, 35294.10– 35294.15.)  Education Code former sections 32228 through 32228.5 were "known as the School Safety and Violence Prevention Act."  (Stats. 2002, ch. 165, § 2 [Ed. Code, former § 32228.1, subd. (a)].)  When amending Education Code former section 32228.1 in 2002, the Legislature found "that over the past decade school violence, specifically 'school terrorism,' has increased dramatically"; that "California has not been immune from these attacks"; that "[i]n nearly all of these cases the perpetrator has either made statements threatening future violence or engaged in overt behavior commonly associated with criminal violence prior to the shooting"; that persons "aware of this behavior often did not report their concerns to school officials or law enforcement"; and "that there is a

20.

compelling need to encourage students, educators, and parents to report threats of violence and violent behavior of pupils and others that pose a danger to school safety." (Stats. 2002, ch. 165, § 1.)

The version of Education Code section 32228 in effect after December 31, 2012, until it was repealed in 2015, stated the Legislature's intent "that public schools serving pupils in any of grades 8 to 12, inclusive, have access to supplemental resources to establish programs and strategies that promote school safety and emphasize violence prevention among children and youth in public schools"; that public schools have access to supplemental resources to combat bias based on race, religion, gender identity, gender expression, sexual orientation and other characteristics and to prevent acts of bias-related incidents; and that school sites receiving funds accomplish specified goals, including the reduction of "incidents of violence at the schoolsite with an emphasis on prevention and early detection." (Stats. 2012, ch. 387, § 1 [Ed. Code, former § 32228, subds. (a), (b), (c)(3)]; see Stats. 2015, ch. 538, § 7.)

The parties' appellate briefs did not cite provisions of the Education Code. The now repealed provisions are described here to show the Legislature was aware of the problem of school shootings and believed such incidents could be reduced by programs emphasizing prevention and early detection. The repealed provisions also provide perspective on what the Legislature has not done. In particular, the Legislature has not explicitly addressed the circumstances in which schools (1) would be *liable* for failing to prevent a shooting (see pt. I.C.4., *post* [mandatory duties]) or (2) would be *immune* from liability for injuries resulting from a shooting. The absence of explicit provisions leads us to the provisions in the Government Claims Act (Act; §§ 810–996.6).

C.    Government Claims Act—Liability Provisions

The Act is a comprehensive statutory scheme governing the liabilities and immunities of public entities and public employees for torts. (*Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 803 (*Quigley*).) An important feature of the

21.

Act is that public entity tort liability is *exclusively* statutory: "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (§ 815.)

The Act systematically deals with certain areas of governmental activity, such as police, fire, medical, and other activities. (2 Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed. 2020) § 11.2, p. 11-8 (Government Tort Liability).) Although school districts are public entities, the wide-ranging activities of the public education system and public recreation and parks programs are not specifically addressed by the Act. (Government Tort Liability, *supra*, § 11.2, p. 11-8.) As a result, these areas of public activity are subject to the Act's general provisions addressing liability and immunity. (See §§ 815–822.2.) Indeed, some of the Act's provisions were drafted with an eye to supervisory duties imposed on public schools and public swimming pools. (Government Tort Liability, *supra*, § 11.2, pp. 11-8 to 11-9; see Recommendation Relating to Sovereign Immunity, No. 1—Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 816 (1963 Recommendation No. 1).)[8]

### 1. *Applicable Liability Provisions*

The statutory grounds for District's liability in this case are sections 820 and 815.2. Section 820 delineates the liability of public employees: "(a) Except as otherwise provided by statute (including Section 820.2), a public employee is liable for injury caused by his act or omission to the same extent as a private person." Section 815.2 provides for a public entity's vicarious liability under the respondeat superior doctrine:

---

[8]  In adopting the Act, the Legislature relied on a series of recommendations from the California Law Revision Commission. (*Quigley*, *supra*, 7 Cal.5th at p. 803.) Therefore, the Law Revision Commission's reports are entitled to substantial weight in construing the Act. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003, fn. 6.)

"(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." In other words, these statutory provisions establish the general rules that (1) an employee of a public entity is liable for his or her torts to the same extent as a private person and (2) the public entity is vicariously liable for any injury which its employee causes to the same extent as a private employer. (*William S. Hart*, *supra*, 53 Cal.4th at p. 868.)

2. *Duty to Supervise*

School districts and their employees are not insurers of student's physical safety, but they have a duty under California law to supervise the conduct of the children on the school grounds and to enforce those rules and regulations necessary for their protection. (*William S. Hart*, *supra*, 53 Cal.4th at p. 869.) In performing these duties, the degree of care required of school personnel is that which a person of ordinary prudence, charged with comparable duties, would exercise under the circumstances. (*Ibid*.) Accordingly, a total lack of supervision or ineffective supervision may constitute a lack of ordinary care by those responsible for student supervision and, if so, would result in the school district being vicariously liable. (*Ibid*.)[9]

3. *Duty to Protect Students*

In addition, California law recognizes that a school district and its employees have a special relationship with the district's students. (*William S. Hart*, *supra*, 53 Cal.4th at p. 869.) As a result of this special relationship, "the duty of care owed by school

---

[9]     The Law Revision Commission Report referred to "the duty to supervise pupils under Education Code Section 13557 and the rules of the State Board of Education" as examples of minimum standards of safety and performance fixed by statute or regulation and stated public entities should be liable for "their failure to exercise reasonable diligence to comply with applicable standards of safety and performance established by statute or regulation." (1963 Recommendation No. 1, *supra*, at p. 816.)

personnel includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." (*Id*. at pp. 869–870.) This duty of care has been applied in both the high school and college setting where the third party who injured a student was another student. (E.g., *J.H. v. Los Angeles Unified School Dist.* (2010) 183 Cal.App.4th 123, 128–129; *Regents*, *supra*, 4 Cal.5th at p. 633 [university had a duty to take reasonable steps to protect students when it became aware of a foreseeable threat to their safety].)

### 4. Mandatory Duties

In closing this overview of the Act's liability provisions, we note that plaintiff did not pursue the theory that District's employees breached a *mandatory duty* established by statute or regulation. The Act recognizes this theory of liability by providing: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (§ 815.6.) This text requires three essential elements: "(1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury." (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179.) Thus, discretionary or permissive action by a public employee cannot result in liability under section 815.6. (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498.) Accordingly, for purposes of liability under section 815.6, it is not enough that the public entity or employee is "under an obligation to perform a function if the function itself involves the exercise of discretion." (*Haggis, supra,* at p. 498; *Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 631–632 (*Creason*).) We note that the absence of a mandatory duty to perform a threat assessment in a particular way does not abrogate the duty of school district personnel to

24.

use reasonable measures to protect students from foreseeable injury caused by negligent or intentional acts of other students.

### D. Government Claims Act—Immunity Provisions

The immunities established by the Act are either general in nature or applicable to specific functional activities or programs. (*Government Tort Liability*, *supra*, § 10.1, p. 10-4.)

#### 1. General Immunity Provisions

The general immunity provision for public entities in section 815.2, subdivision (b) and the immunity for discretionary acts and omissions of public employees in section 820.2 provided context for the specific immunity relied upon by District.

First, section 815.2, subdivision (b) provides: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." The Law Revision Commission comment to section 815.2 states this provision "makes clear that in the absence of a statute a public entity cannot be held liable for an employee's act or omission where the employee himself would be immune." (1963 Recommendation No. 1, *supra*, at p. 838.) The comment also states the provision nullifies dictum in a 1961 case suggesting "that public entities may be liable for the acts of their employees even when the employees are immune." (*Ibid.*)

Second, section 820.2 grants immunity to public employees for injuries resulting from certain discretionary decisions by providing: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." This immunity was examined in detail by the Supreme Court in *Johnson v. State of California* (1968) 69 Cal.2d 782 (*Johnson*). In *Johnson*, the court noted "that virtually every public act admits of some element of discretion." (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425,

445.)[10]  As a result, the court "distinguished between basic policymaking or 'planning'

on the one hand and ministerial or 'operational' levels of decisionmaking on the other

hand, holding that the first category triggered immunity while the latter category did not.

[Citation.]  *Johnson* concluded that although the basic policy decision (such as standards

for parole) warrants immunity, 'subsequent ministerial actions in the implementation of

that basic decision still must face case-by-case adjudication on the question of

negligence.' "  (*Perez-Torres v. State of California* (2007) 42 Cal.4th 136, 142–143.)  In

this appeal, District has not relied on the general immunity provided by section 820.2,

apparently conceding that the negligent acts and omissions of its employees occurred at

the operational level of decisionmaking and not at the policymaking level.

### 2.  *Specific Immunity for Mental and Physical Examinations*

The immunity relied upon by District is contained in section 855.6, which

provides:

> "Except for an examination or diagnosis for the purpose of treatment,
> neither a public entity nor a public employee acting within the scope of his
> employment is liable for injury caused by the failure to make a physical or
> mental examination, or to make an adequate physical or mental
> examination, of any person for the purpose of determining whether such
> person has a disease or physical or mental condition that would constitute a
> hazard to the health or safety of himself or others."

The comment to section 855.6 states:

> "It grants an immunity for failure to perform adequately public health
> examinations, such as public tuberculosis examinations, physical
> examinations to determine the qualifications of boxers and other athletes,
> and eye examinations for vehicle operator applicants.  It does not apply to
> examinations for the purpose of treatment such as are made in doctors'
> offices and public hospitals.  In those situations, the ordinary rules of
> liability would apply.

---

**10**  In *Tarasoff*, the court concluded "that the therapist defendants' failure to warn [the murder victim] or those who reasonably could have been expected to notify her of [the] peril [posed by the therapists' patient] does not fall within the absolute protection afforded by section 820.2."  (*Tarasoff*, *supra*, at p. 446.)

"The immunity provided by this section relates only to failure to make any examination or, if an examination is made, to the 'adequacy' of the examination; the section does not provide immunity, for example, where a public employee negligently injures a person while making an examination." (1963 Recommendation No. 1, *supra*, at p. 865.)

Before analyzing the meaning of section 855.6 and its application to the facts of this case, we consider the parties' contentions about the applicable standard of review and the nature of District's claim of trial court error involving the application of section 855.6.

## II.    IMMUNITY UNDER SECTION 855.6

### A.    Standards of Review

The parties agree on the two standards of review applied to a trial court's decision to deny a motion for judgment notwithstanding the verdict. When the issue raised is whether sufficient evidence supports the jury's factual findings, appellate courts apply the substantial evidence standard. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.) Alternatively, when the appeal raises purely legal questions, appellate courts apply the independent (i.e., de novo) standard of review. (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1045 [all facts essential to issue of ostensible agency were undisputed; jury's finding of ostensible agency was contrary to the law; judgment was reversed].)

District contends the issue of whether section 855.6's immunity attached "raises no issues of fact; the jury found what it found, meaning this Court need only determine whether those undisputed facts give rise to immunity under … section 855.6." Based on this framing of the issue being raised by its appeal, District contends de novo review applies.

Plaintiff disagrees with District's contention that the question of immunity raises purely legal issues and therefore is subject to de novo review. Plaintiff asserts de novo review is proper only where all of the facts essential to the issue are undisputed and, here, certain facts were vigorously disputed throughout the trial. Plaintiff asserts the jury was properly instructed about the immunity provided by section 855.6 and the parties

disputed whether all of the employee's conduct in implementing the threat assessment protocol constituted a "medical examination" of Bryan. Plaintiff further asserts the jury rejected District's argument that all of its employees' acts and omissions were inextricably intertwined with Shoffner's examinations of Bryan. In plaintiff's view, the jury resolved the factual dispute by finding that the District employee's conduct apart from the medical examinations conducted by Shoffner constituted negligence that was a cause of plaintiff's injuries.

In reply, District argues that plaintiff has inaccurately tried "to paint the issue as being about a dispute over evidence" and reasserts that its challenge is not a dispute about the evidence. District contends the immunity issue turns on the interpretation of section 855.6, which is a question of law subject to de novo review. In District's view of the record, the case presented to the jury was based on the trial court's ruling that confined the section 855.6 immunity to Shoffner's mental examination of Bryan and, as a result, the issue of whether the immunity extended to the entire threat assessment team never went to the jury. District reiterates that this question about the scope of the immunity presents an issue of law for the court to decide.

We accept District's contention that the immunity issue it has raised turns on the interpretation of section 855.6. Issues of statutory interpretation and the application of that interpretation to an established set of facts are questions of law subject to independent review by appellate courts. (E.g., *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492; *Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417.) Here, the relevant set of facts is established by the rule that the appellate court must view "the evidence in the light most favorable to plaintiff[], disregarding conflicting evidence, and drawing all legitimate inferences in [plaintiff's] favor." (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192; see *Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 265, fn. 1.)

## B. Public Employees Covered by the Immunity

The first question of statutory construction presented by District is whether the section 855.6 immunity is limited to health care professionals. The relevant text provides the immunity to "a public employee acting within the scope of his employment" who fails to make an examination meeting the other statutory requirements. (§ 855.6.) Our interpretation of this statutory text begins by considering whether the phrase "a public employee" is ambiguous—that is, whether it is reasonably susceptible to being interpreted to mean only employees that are health care professionals. We conclude the phrase itself is not ambiguous and it does not, by its plain meaning, limit the immunity to health care professionals. In other words, any public employee may qualify for the immunity's protection so long as the examination in question meets the other requirements of section 855.6.

This statutory interpretation is consistent with the examples given in the comment to section 855.6, which include "eye examinations for vehicle operator applicants." (1963 Recommendation No. 1, *supra*, at p. 865.) The examinations conducted in connection with the issuance of a driver's license include "[a] test of the hearing and eyesight of the applicant, and of other matters that may be necessary to determine the mental and physical fitness of the applicant to operate a motor vehicle upon the highways." (Veh. Code, § 12804.9, subd. (a)(1)(E).) We take as a matter of common knowledge that the eyesight test conducted by employees of the Department of Motor Vehicles are not performed by licensed ophthalmologists or optometrists. As a result, providing immunity to the public employees who conduct those eyesight tests is an example of the immunity being applied to employees other than health care professionals.

Our statutory construction also is confirmed by long-standing case law. In *Lucas v. City of Long Beach* (1976) 60 Cal.App.3d 341, a mother brought a wrongful death action against a city and a police sergeant after her 17-year-old son hung himself in a cell at a juvenile detention facility. (*Id*. at p. 344–345.) Among other things, the jury found

29.

the sergeant negligent because a reasonable person would have provided medical care or attention to the juvenile. (*Id*. at p. 346.) The appellate court reversed the judgment. (*Id*. at p. 351.) Addressing the application of section 855.6, the court stated that it "bars any claim based on the failure to have [the juvenile] examined medically." (*Lucas, supra,* at p. 350.) The court's application of the section 855.6 immunity to the police officer supports the interpretation that the section 855.6 immunity for "a public employee" is not limited to health care professionals.

      C.     Scope of the Covered Mental Examination

          1.     *Statutory Text*

The second question of statutory construction presented by District addresses the scope of the public employee's conduct that falls within the section 855.6 immunity. For purposes of this appeal, the conduct (i.e., the acts and omissions) covered is "the failure to make a … mental examination, or to make an adequate … mental examination," so long as the examination meets the other statutory requirements. (§ 855.6.) Other requirements are that the examination must be "of any person for the purpose of determining whether such person has a … mental condition that would constitute a hazard to the health or safety of himself or others." (§ 855.6.) Also, in accordance with the statute's exception, the examination must not be "for the purpose of treatment."[11] (§ 855.6.)

---

[11]     The application of the exception for treatment is not among the issues raised in this appeal. We note that several of the cases concluding that the section 855.6 immunity does not apply are based on the exception for examinations done for the purpose of treatment. (E.g., *Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1059–1060 [immunity did not apply to registered nurse's examination of arrestee because its purpose was to determine if arrestee needed medical treatment]; *Smith v. County of Kern* (1993) 20 Cal.App.4th 1826, 1833–1835 [immunity did not apply because purpose of blood test of third person was to diagnose and treat plaintiffs' exposure to acquired immunodeficiency syndrome].)

### 2. *Contentions of the Parties*

District contends the language of section 855.6 should be interpreted broadly to protect any public employee (and the public entity employer) involved in an examination *and related investigation*. Based on this interpretation, District contends all members of the threat assessment team are immune and, therefore, judgment should be entered in its favor.

District argues that its interpretation comports with the broad interpretation of the Act's other immunities that protect entities and employees when they gather information and make decisions affecting public safety. In District's view of how humans react to rules of law, this broad interpretation of the immunity will "encourage public entities and employees to diligently pursue these examinations, without fear that an expert will someday tell a jury that a death or injury could have been avoided if a public employee would have just done his or her job better." This view implies that the fear of being second guessed inhibits school district personnel from conducting or diligently pursuing a threat assessment. District summarizes its policy argument as follows:

> "In an era in which student-on-student violence grows in frequency and intensity, the policy behind Government Code section 855.6—protecting public entities and employees from second-guessing their examinations of persons to determine threats to public safety, and thus encouraging those examinations—becomes more vital than ever."

Plaintiff responds by contending that section 855.6, by its express terms, applies *only* to examinations and nothing else. Plaintiff supports his use of the word "only" by quoting the comment to section 855.6, which reads in part: "The immunity provided by this section relates *only* to failure to make any examination or, if an examination is made, to the 'adequacy' of the examination." (1963 Recommendation No. 1, *supra*, at p. 865, italics added.) Plaintiff contends this statutory interpretation furthers the important public policy of requiring schools to take reasonable steps to protect their students from foreseeable and preventable harm. Plaintiff asserts parents who entrust public schools with their children are entitled to expect nothing less.

Plaintiff asserts the trial court accurately construed section 855.6, the jury was properly instructed, and plaintiff abided by the court's ruling not to introduce evidence challenging the adequacy of Shoffner's sessions with Bryan. Plaintiff further contends that the jury was presented with overwhelming evidence of negligent behavior not involving any mental examinations of Bryan. Plaintiff reiterated the trial court's view that the negligent behavior included the failure of the threat assessment team members to (1) carry out the assessment collectively; (2) communicate with one another concerning Bryan; (3) include the school resources officer in the threat assessment; (4) adequately communicate with Bryan's mother; (5) recommend counseling to Bryan's mother as an intervention tactic; and (6) collectively continue to monitor Bryan and reassess the safety plan.

### 3. Activity Included in a Mental Examination of a Person

Section 855.6 and the Act do not define "physical examination," "mental examination" or "examination" and do not otherwise address what acts are encompassed or excluded by these terms. Similarly, section 855.6's comment does not define these terms, although it gives examples of immune examinations. Another potential source of a definition is California case law. However, the parties have not cited, and we have not located, a decision defining the term "examination" for purposes of section 855.6.

In the absence of a legislative definition or established precedent, courts give the words of a statute their usual and ordinary meaning. (*Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 924.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word" (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122), although the process of interpreting statutes involves more than simply stitching together dictionary definitions (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 673).

One dictionary defines "examination" to mean "the act or process of examining … SEARCH, INVESTIGATION, SCRUTINY." (Webster's 3d New Internat. Dict. (1993)

32.

p. 790.) In turn, that dictionary's definitions of the verb "examine" include "to test by an appropriate method **:** INVESTIGATE: as **a :** to look over **:** inspect visually or by use of other senses … **b :** to inspect or test for evidence of disease or abnormality." (*Ibid.*) Another "dictionary definition of 'examination' reads: '1: the act or process of examining: the state of being examined[;] 2: an exercise designed to examine progress or test qualification or knowledge[;] 3: a formal interrogation[.]' [Citation.]" (*Lutes v. Schaefer* (Mo.App. 2014) 431 S.W.3d 550, 556, fn. 4.) In *Lutes*, the court concluded this wide range of meanings offered little guidance and, as a result, the court turned to the primary rule of statutory interpretation that requires courts to give effect to legislative intent. (*Ibid.*)[12]

Our consideration of the legislative purpose underlying section 855.6 includes an examination of the comment to that section and the other statements about the immunity in the Law Revision Commission Report. The report includes a section labeled "RECOMMENDATIONS" that contains a subsection titled "Medical, Hospital and Public Health Activities." (1963 Recommendation No. 1, *supra*, at pp. 814, 829.) The paragraph addressing physical examinations begins:

> "Public entities and public health officials and other public employees who are required to examine persons to determine their physical condition should not be liable for failing to examine or to make an adequate examination of any person for the purpose of determining whether such person has a communicable disease or any other condition that might constitute a hazard to the public or to the person examined." (1963 Recommendation No. 1, *supra*, at p. 831.)

The third numbered paragraph of that subsection of the report addresses mental examinations and states:

---

[12] In *Lutes*, the court concluded, after considering how the term was used in other statutes, that a records review in which a physician or nonphysician does not perform a physical inspection of the claimant is not an "examination" for purposes of Missouri's workers' compensation law. (*Lutes*, *supra*, at p. 556.)

"Public entities and public employees should not be liable for negligence in diagnosing that a person is afflicted with mental illness or mental deficiency.  Nor should liability be imposed for negligence in prescribing treatment for such conditions.  Much of the diagnosis and treatment of these conditions goes on in public mental institutions.  The field of psychotics is relatively new and standards of diagnosis and treatment are not as well defined as where physical illness is involved.  Moreover, public mental hospitals must take all patients committed to them; hence, there are frequently problems of supervision and treatment created by inadequate staff and excessive patient load that similar private hospitals do not have to meet."  (1963 Recommendation No. 1, *supra*, at p. 830.)

The paragraph also states that no tort liability should exist for determining whether to confine a person for a mental or emotional disturbance, determining the terms of confinement of a person so committed, or determining to release or parole a confined person.  (1963 Recommendation No. 1, *supra*, at p. 830; see *Kravitz v. State of California* (1970) 8 Cal.App.3d 301 [state doctors who recommended patient be released from state hospital were not liable to parents of girl killed by the patient].)  The last paragraph of the subsection includes a general statement regarding the immunities:

"Government undertakes these activities to insure public health and safety and to add a measure of safety to some hazardous occupations, such as boxing.  To provide the utmost public protection, public entities should not be dissuaded from engaging in such activities by the fear that liability may be imposed if an employee performs his duties inadequately.  Far more persons would suffer if government did not perform these functions at all than would be benefitted by permitting recovery in those cases where the government is shown to have performed inadequately."  (1963 Recommendation No. 1, *supra*, at p. 831.)

Based on the Law Revision Commission Report, there appear to be three main public policies that justify the immunity for examinations conducted by public employees.

First, without the immunity, public entities would be dissuaded from undertaking the examinations due to fear that liability might be imposed if an examination is inadequately performed.  The immunity removes this fear of liability and, thus, encourages examinations that otherwise would not be performed, which benefits society

34.

in general.  This overall benefit is seen as large enough to justify not compensating individuals who are injured when the examinations are negligently performed.  (See *Creason*, *supra*, 18 Cal.4th at p. 638 [depriving medical screening programs from testing immunity could discourage further testing, to the ultimate detriment of the programs and public].)

Second, public institutions have a high volume of persons in need of services and imposing liability would divert resources and exacerbate the institutions' difficulties in serving the public.  Thus, it is reasonable to hold public institutions immune while subjecting private institutions to liability because, in theory, those private entities are able to spread the cost of liability across their customer base.

Third, with respect to mental examinations, it is a field that does not have well established standards and it is difficult to predict how the person examined will behave in the future.

The foregoing policies will guide our determination of the scope of the acts and omissions that fall within the scope of the mental examinations that are immune under section 855.6.  In addition, the process of determining the meaning of the term "mental examination" is informed by the prepositional phrases that modify and narrow the reach of the term.  The first prepositional phrase is "of any person."  (§ 855.6.)  The additional prepositional phrases limit the immunity to examinations performed "for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others."  (§ 855.6.)  Some insight into the meaning of the prepositional phrase "of any person" can be gained from the Law Revision Commission Report's reference to "public employees who are required to examine persons."  (1963 Recommendation No. 1, *supra*, at p. 831.)

Based on the underlying public policies, the range of definitions of "examination" and "examine," the phrase "of any person," and the comment that states the immunity

relates only to examinations,[13] we conclude the statutory interpretation that best effectuates the legislative purpose of the Act limits the phrase "mental examination of any person" to the process of inspecting visually or by use of the other senses the physical, emotional and mental state of the person in question. Typically, this inspection would involve a face-to-face meeting between the public employee and the individual in question. However, the inspection also could include interviews by telephone or videoconference.

This interpretation balances the policies underlying the immunity and the policies underlying a school district's duty to protect students, which is based on the special relationship between a school district and its students. (See *William S. Hart*, *supra*, 53 Cal.4th at pp. 869–870.) "The most commonly mentioned aims of tort law are (1) compensation of the injured persons and (2) deterrence of undesirable behavior." (Dobbs, et al., The Law of Torts (2021 2d ed.) § 10.) The undesirable behavior that the duty to protect students seeks to deter is the lack of ordinary care by school employees in performing that duty. In other words, the duty to protect students and the related liability was imposed to incentivize school districts and their employees to take action protecting students. Thus, applying the section 855.6 immunity to all negligent acts or omissions of a threat assessment team would undermine the goal of protecting students, rather than encouraging school districts to diligently perform the threat assessment. For instance, immune school administrators, freed from fear of liability, could choose a course of action that minimizes the publicity a potential threat receives on social media and elsewhere instead of a course of action that implements reasonable measures to protect students.[14]

---

**13** The comment states the section 855.6 immunity "relates only to failure to make any examination or, if an examination is made, to the 'adequacy' of the examination. (1963 Recommendation No. 1, *supra*, at p. 865.)

**14** For example, in this case, when a female student went to Angelo and told Angelo about Bryan showing her a hit list with two names on it at the end of her junior year (i.e.,

36.

We are not convinced by District's argument that the failure to immunize all the acts and omissions of a threat assessment team would dissuade public schools from undertaking threat assessments. Threat assessments are not comparable to a screening program that might be abandoned for fear of liability. School districts have been incentivized to perform threat assessments by our Supreme Court's recognition of the duty to protect. Immunizing all activities related to the threat assessment would undermine the reasons for recognizing the duty to protect students and, contrary to District's argument, is unlikely to improve the quality of threat assessments.

Consequently, the trial court did not misinterpret section 855.6 when it concluded that all acts and omissions of the threat evaluation teams were not covered by the immunity for a "mental examination[] of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." (§ 855.6.) District employees breached their duty of care because (1) the threat assessment was not carried out by the team collectively; (2) the school resource officer (i.e., the law enforcement officer assigned to the school) should have been a core member of the team; (3) the threat assessment team failed to communicate amongst themselves about Bryan; (4) the threat assessment team failed to adequately communicate with Bryan's parent; (5) the threat assessment team failed to recommend counseling to Bryan's parent as an intervention technique; and (6) the threat assessment team did not continue to collectively monitor Bryan and reassess the safety plan. These acts and omissions fell outside the immunity provided for mental examinations. Accordingly, we reject District's first claim of error.

---

after February 2012), Angelo told the student that she had already taken care of the hit list incident. Thus, the additional information provided by the female student did not result in a further evaluation by the threat assessment team.

37.

III.    SUBSTANTIAL EVIDENCE SUPPORTS THE FIELDS CAUSATION
        FINDING*

       A.    Legal Principles Relating to Causation

The generic elements of a tort claim are wrongdoing, causation, and harm.  (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.)  The elements of a negligence cause of action are (1) a legal duty of care, (2) a breach of that duty, (3) proximate causation—that is, a connection between the defendant's breach of duty and the resulting injuries, and (4) actual damages.  (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106.)

The element of proximate causation is resolved by a trier of fact using the substantial factor test.  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968; *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050–1053.)  Here, the jury instruction on the substantial evidence test was based on CACI No. 430, "Causation: Substantial Factor," and stated:  "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm."

Proximate cause is ordinarily a question of fact for the jury.  (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 198.)  " 'Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' "  (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 353.)  When the sufficiency of the evidence to support a jury's finding of fact is raised, appellate courts apply the substantial evidence standard of review.  (*Hauter v. Zogarts*, *supra*, 14 Cal.3d at p. 110.)

The parties do not dispute the foregoing basic principles.  They agree causation usually presents a question of fact, the trier of fact determines the issue of causation by

---

\*      See footnote, *ante*, page 1.

38.

applying the substantial factor test, and challenges to the sufficiency of the evidence to support a jury's causation finding are governed by the substantial evidence test.[15]

### B. Issue Raised by District

#### 1. Background

District's claim of a trial court error is set forth in a heading in its opening brief that asserts there is no substantial evidence of a causal link between any conduct of Fields and plaintiff getting shot. We specifically refer to the heading's contents because it defines the issue District is pursuing in this appeal. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [use of headings].) Appellate courts routinely conclude that an appellant forfeits an argument by failing comply with the rule requiring each argument be presented under a separate heading. (E.g., *Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 952; *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201.)

The context for District's claim of insufficient evidence to support the causation finding is established by noting the findings and rulings not being challenged by District. First, the headings in District's opening brief do not challenge the jury's finding that Fields was negligent. Second, District's headings do not assert the trial court committed prejudicial evidentiary error when it overruled District's objections to some of the testimony relied upon by plaintiff to establish school resource officer Fields's negligence and its causal link to plaintiff's injuries.

---

**15** Under traditional tort principles, the misconduct of a third party is regarded as breaking the chain of legal causation between the defendant's negligence and the plaintiff's injuries where the third party's conduct operated as a superseding or supervening cause. (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 770 (*Cole*).) The third party's misconduct ordinarily will not be regarded as a supervening cause if the misconduct itself was foreseeable to the defendant. (*Ibid.*) The jury was instructed on superseding cause using CACI No. 433. District does not contest the jury's implied finding that Bryan's conduct was not a superseding cause.

Edward Whiting was the Taft police department's chief of police from December 2010 until he retired in March 2018.  He testified that after the shooting he had a conversation with Fields about the incident.

Chief Whiting answered "yes" when asked if, during that conversation, Fields told him "something about two [Regional Occupational Program] employees or staff members telling [Fields] … before the shooting that they were scared of Bryan."  Chief Whiting also answered "yes" when asked if Fields told him "that he had been told before the shooting by these [Regional Occupational Program] employees that they had escape plans in case Bryan … attacked them."  Defense counsel's objections to these questions as hearsay and for lack of foundation were overruled.

When Fields testified, he was asked if, before the shooting, Regional Occupational Program employees has shared with him some concerns they had about Bryan.  Fields answered, "I don't think they shared that with me.  I heard that information from Mrs. Kaszycki."  When asked if he talked to Chief Whiting about the employees saying that they were afraid of Bryan and that they had escape plans in case Bryan attacked them, Fields reiterated that he had heard that from Kaszycki, not directly from the employees.  The follow-up question asked:  "Did you tell Chief Whiting that, sir, after the shooting?"  Fields answered:  "I could have.  I could have, yes.  I don't recall, but it's possible."

3.  *The Parties' Views of the Evidence*

District's opening brief recounts the foregoing testimony and asserts:  "There is no evidence that … Fields ever did anything with this information.  Nor was any evidence introduced as to how this information might have prevented Bryan … from shooting [plaintiff]."  In response, plaintiff's states "Fields was negligent for doing nothing despite being directly told by employees that they feared Bryan and had escape plans in the event Bryan acted on their fears."  As to the connection between Fields's negligent inaction and plaintiff's injury, plaintiff asserts that "the jury could well properly conclude that had

Fields reported the additional threat, it may have triggered further action by the other school employees responsible for the threat assessment."

### 4. The Trial Court's View of the Evidence

The trial court's written order denying District's motion for judgment notwithstanding the verdict addressed causation as to the failures of the threat assessment employees, which excluded Fields, and determined the evidence was sufficient. The court next addressed causation as to Fields's conduct, stating:

> "Fields is in a little different category. He was not a member of the threat assessment team. He was a school security officer. The evidence of Fields' negligence is that he failed to report a conversation with District employees wherein they stated that [Bryan] was a threat and that they had made escape plans should [Bryan] act upon their fears. This was more in the category of negligence to be assessed within the common experience of jurors. Since the court instructed upon the standards of ordinary negligence, and Fields was found only 1% at fault, there is insufficient basis to grant the motion on this ground. There is sufficient evidence that had Fields reported the additional threat, it may have triggered further action by the employees responsible for the threat assessment."

As a result, the court upheld the jury's finding that Fields's negligence was a substantial factor in causing plaintiff's harm.

### D. Case Law Addressing Third Party Assaults

District's arguments regarding causation rely heavily on our Supreme Court's discussion of causation in *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 (*Saelzler*). In that case, the plaintiff sued the owners of a large apartment complex after she had been raped by an unknown assailant while attempting to deliver a package. The trial court granted summary judgment, concluding the plaintiff had failed to show the defendants' breach of a duty to safeguard was a proximate cause of the assault. (*Id*. at p. 771.) The Court of Appeal reversed, concluding there was a triable causation issue for the jury. (*Ibid*.) The Supreme Court reversed, directing the summary judgment for the defendants be affirmed. (*Id*. at p. 781.)

In *Saelzler*, the plaintiff alleged the defendants were negligent in managing the apartment complex because they failed to provide additional security guards or locked security gates that functioned. (*Saelzler*, *supra*, 25 Cal.4th at p. 767.) The Supreme Court reached the causation issue by assuming that the defendants breached a duty to provide a reasonable degree of security "by failing (1) to keep all entrance gates locked and functioning, and (2) to provide additional daytime security guards to protect persons such as plaintiff." (*Id*. at p. 775.) The court concluded the plaintiff could not show the assumed breaches were a substantial factor in causing her injuries because she was unable to prove the identity or background of her attackers and, therefore, the attackers might have been authorized to be on the premises. (*Id*. at p. 776.) The court rejected her expert's opinion that the injuries could have been avoided if the defendants had hired roving security guards during the day because the opinion was speculative and plaintiff could not show that the roving guards would have encountered the assailants or prevented the attack. (*Id*. at pp. 776–777.)

Similarly, the appellate court in *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, upheld a summary judgment in favor of an apartment owner that was sued for negligence by a tenant who was raped by an unknown assailant. (*Id*. at p. 476.) The tenant alleged the owner was negligent because it failed to repair a broken security gate, which was a cause of the rape. (*Ibid*.) In affirming the summary judgment, the appellate court stated: "Where, as here, there is evidence that the assault could have occurred even in the absence of the landlord's negligence, proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence." (*Id*. at p. 488.) Addressing the evidence, the court stated: "Since there is no direct evidence that the rapist entered or departed through the broken gate (or even that the broken gate was the only way he could have entered or departed), [plaintiff] cannot survive summary judgment simply because it is *possible* that he *might* have entered through the broken gate." (*Id*. at p. 483.)

42.

In contrast to the cases with unknown assailants, *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225 (*Rosh*), involved a disgruntled former employee, Hua, who shot a manager at a manufacturing facility. The manager sued the manufacturer's security firm for negligently failing to provide adequate security at the facility. (*Id.* at p. 1229.) The jury awarded the manager and his wife damages in excess of $5 million. (*Ibid.*) The security firm appealed, contending there was no evidence that its conduct proximately caused the plaintiffs' injuries. (*Ibid.*) The appellate court affirmed the judgment. (*Id.* at p. 1240.)

In *Rosh*, the security firm's employees had been told that Hua's employment was terminated and that he was not permitted on the premises. (*Rosh*, *supra*, 26 Cal.App.4th at p. 1230.) However, the security firm failed to disseminate this information to all its employees. (*Id.* at p. 1236.) Hua entered the premises three times within 26 hours of his termination and the firm was told each time that Hua was on the premises without authorization. (*Ibid.*) In analyzing causation, the appellate court stated:

> "Defendant's employees assured others the matter would be resolved; however, they did nothing on each occasion. Moreover, there was no parking guard on duty when Mr. Hua entered the premises. Based on this evidence, the jury could have reasonably concluded that Mr. Hua's multiple, unrestricted entries demonstrated to him how lax defendant's security was and that he could freely enter the premises and cause injury to [the manager]." (*Rosh*, *supra*, 26 Cal.App.4th at p. 1236.)

The court concluded it was reasonably foreseeable at the time of the security firm's negligent conduct that Hua would harm the manager and there was sufficient evidence that its negligence was a substantial factor in facilitating the attack on the manager. (*Rosh, supra,* 26 Cal.App.4th at p. 1236.)

E.     Analysis of Causal Link

In *Cole*, the court recognized that "it is entirely possible for an injury to result from multiple tortious acts or omissions, in which case all authors of the injurious conduct may be liable, provided the conduct of each satisfies the test of proximate or

43.

legal cause." (*Cole*, *supra*, 205 Cal.App.4th at p. 769; see Rest.2d, Torts, § 430, com. d.) Thus, "[w]here the separate and distinct negligent acts of two persons are in substantially simultaneous operation, and contribute to the injury, 'each is and both are the proximate cause.' " (6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1344, p. 649 [concurring causes].)

Consequently, in analyzing the causal link between Fields's negligent conduct and plaintiff's injury, we consider how Fields's negligent failure to report information fits with the negligent acts and omissions of the members of the threat assessment team. The trial court identified at least three ways the threat assessment team's handling of information within the team breached the standard of care—that is, (1) the school resource officer was excluded from participation in the threat assessment, (2) the threat assessment teams failed to communicate with one another concerning Bryan, and (3) the threat assessment was not carried out by the team collectively. Fields's failure to report the conversation about Regional Occupational Program employees being afraid of Bryan and having escape plans is another example of a failure to handle information with ordinary care. The multiple failures of District employees to handle information with ordinary care combined (i.e., concurred) to cause the assessment team's failure to adequately address the threat Bryan posed, resulting in plaintiff's injuries. This is not a case of an unknown assailant where the trier of fact had to guess how the unidentified assailant might have been stopped. Here, the causal chain was identified by Meloy, who testified that if the threat assessment team had operated within the standard of care, it was more likely than not that the shooting would have been prevented. The jury could rationally find that Fields's negligent failure to report information, mixed with the assessment team's communications failures, was a substantial factor in assessment team's failure to prevent the shooting.

Consequently, we conclude the trial court correctly denied District's motion to set aside the jury's finding that Fields's negligence was a cause of plaintiff's harm.

## DISPOSITION

The judgment is affirmed.  Plaintiff shall recover his costs on appeal.


                                                                    FRANSON, J.

WE CONCUR:


DETJEN, ACTING P. J.


DE SANTOS, J.